# IN THE UNITED STATES COURT OF APPEALS

# FOR THE ELEVENTH CIRCUIT

_____

## Appeal No. 22-14192-D
_____

## UNITED STATES,

## Appellee

## v.

## STEVEN CHUN,

## Appellant

_____

## A DIRECT APPEAL OF A CRIMINAL CASE
## FROM THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## DISTRICT COURT CASE NO. 8:20-cr-00120-WFJ-JSS
_____

## INITIAL BRIEF OF APPELLANT
_____

J. Jervis Wise, Esq.
Brunvand Wise, P.A.
615 Turner Street
Clearwater, FL 33756
Florida Bar # 0019181
Telephone:  727-446-7505
Facsimile:  727-446-8147
E-Mail: jervis@acquitter.com
Counsel for Appellant Chun

No. 22-14192-D

*United States v. Chun, et al*

<u>CERTIFICATE OF INTERESTED PERSONS</u>

In compliance with Federal Rule of Appellate Procedure 26.1 and 11th Cir. Rule 26.11, the undersigned hereby certifies that the following listed persons and entities have an interest in the outcome of this particular case:

1. Albrecht, Carol, alleged victim;

2. Brunvand, Bjorn E., trial counsel for co-defendant;

3. Campbell, Tamera, alleged victim;

4. Chang, John, alleged victim;

5. Chun, Steven, appellant;

6. Diaz-Rivera, Myrdalis, alleged victim;

7. Flynn, The Honorable Sean P., United States Magistrate Judge;

8. Futerman, Roger, trial counsel for co-defendant;

9. Gershow, Holly, Assistant United States Attorney;

10. Handberg, Roger B., United States Attorney, Middle District of Florida;

11. Hoppmann, Karin, former Acting United States Attorney;

12. Howard-Allen, Kelley Clement, Assistant United States Attorney;

13. Jung, The Honorable William F., United States District Court Judge;

14. Lopez, Maria Chapa, former United States Attorney;

15. Medicare, alleged victim;

16. Nebesky, Suzanne C., Assistant United States Attorney;

17. Peresie, Jennifer Lynn, Assistant United States Attorney;

18. Rankin, Mark P., trial counsel for appellant;

19. Reder, Jessica N., Assistant United States Attorney;

20. Simonsen, Julie A., Assistant United States Attorney;

21. Smith, Gregory (deceased), alleged victim;

22. Sneed, The Honorable Julie S., United States Magistrate Judge;

23. Tondre, Daniel, co-defendant in the lower court;

24. Tuite, Hon. Christopher P., United States Magistrate Judge;

25. Waid, Nicole Hughes, trial counsel for appellant;

26. Wise, J. Jervis, appellate counsel for appellant Chun;

27. Zimmerman, Warrant, appellate counsel for appellant Tondre.

No publicly traded company or corporation has an interest in the outcome of this appeal to the undersigned's knowledge.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellant Steven Chun respectfully requests oral argument on this appeal. Counsel believes oral argument will be beneficial to the Court in its resolution of the issues presented herein, particularly given the volume of the record from the lower court and the fact-intensive nature of the issues raised.

# TABLE OF CONTENTS

**Page**

Certificate of Interested Persons ............................................................ C1

Statement Regarding Oral Argument .......................................................i

Table of Contents .........................................................................................ii

Table of Citations .........................................................................................v

Statement of Jurisdiction........................................................................ ..1

Statement Regarding Adoption............................................................. ..1

Statement of the Issues...............................................................................2

Statement of the Case..................................................................................3

i)      Course of Proceedings and Disposition in the Court Below ...........................3

ii)     Statement of the Facts ....................................................................4

A. Subsys' Entry in the Market..........................................................4

B. Insys' Speaker Program ................................................................5

C. Tracy Krane's Tenure as Sales Representative.............................9

D. Daniel Tondre's Tenure as Sales Representative .........................12

E. Various Other Government Witnesses .........................................17

F. Government Witnesses Alec Burlakoff and Michael Babich .......19

G. Daniel Tondre's Testimony .........................................................22

H. Motion for Judgments of Acquittal..............................................23

**TABLE OF CONTENTS, Continued**

**Page**

I. Closing Arguments Concerning Text Messages ...............................24

J. Jury Questions ....................................................................25

K. Sentencing ........................................................................26

iii)    Standards of Review........................................................27

Summary of the Arguments ......................................................29

Arguments and Citations of Authority.........................................30

I.    THE DISTRICT COURT ERRED IN DENYING DR. CHUN'S MOTION FOR JUDGMENTS OF ACQUITTAL BECAUSE THE GOVERNMENT FAILED TO PROVE SEVERAL OF THE NECESSARY ELEMENTS OF THE CHARGES .......................................30

A. The Government Failed to Prove the Substantive Counts Because the Evidence was Insufficient to Show that Dr. Chun Acted Willfully and With Specific Intent to do Something the Law Forbids .....................................................................31

B. The Government Similarly Failed to Prove that Dr. Chun Conspired to Violate the Anti-Kickback Statute.......................................34

1. The Evidence was Insufficient to Permit a Finding that Dr. Chun Knowingly and Voluntarily Participated in an Unlawful Agreement ....................................................................35

2. The Evidence in the Instant Case was Far Different from the Evidence Presented Against Defendants Who Faced Similar Allegations...................................................................38

C. As to Both the Substantive and Conspiracy Counts, the Government Failed to Prove the Requisite Medicare Element................42

**TABLE OF CONTENTS, Continued**

**Page**

II.   THE DISTRICT COURT INVADED THE PROVINCE OF THE
      JURY WHEN IT ANSWERED THE TWO JURY QUESTIONS AT
      ISSUE .......................................................................................45

      A. The Question Concerning the Calculation of the Per Unit Costs.............49

      B. The Question Concerning the Text Messages..........................................50

III.  THE DISTRICT COURT ERRED IN HOLDING DR. CHUN
      ACCOUNTABLE FOR THE ENTIRE AMOUNTS PAID BY
      MEDICARE, AS OPPOSED TO THE NET VALUE OF THE
      IMPROPER BENEFIT TO BE CONFERRED BY THE ALLEGED
      ILLEGAL REMUNERATIONS ..................................................................52

      A. Section 2B4.1 Requires a Calculation of the *Net* Value of the
         Benefit to be Conferred ............................................................52

      B. The Court Erred in Determining the Offense Level Applicable
         Under U.S.S.G. § 2B4.1 ...........................................................54

Conclusion .................................................................................................57

Certificate of Compliance with Rule 32(a)...............................................58

Certificate of Service ................................................................................59

## <u>TABLE OF CITATIONS</u>

**<u>Cases</u>**                                                                                                   **<u>Page</u>**

*Bollenbach v. United States*,
    326 U.S. 607, 66 S.Ct. 402, 90 L.Ed. 350 (1946)..............................................45

*Ruan v. United States*,
    --- U.S. ---, 142 S.Ct. 2370, 213 L.Ed.2d 706 (2022).......................................40

*United States v. Adkinson*, 158 F.3d 1147 (11th Cir. 1998) ..................................34

*United States v. Chandler*, 388 F.3d 796 (11th Cir. 2004)....................................34

*United States v. Clough*, 978 F.3d 810 (1st Cr. 2020)............................... 38-39, 41

*United States v. Cole*, 755 F.2d 748 (11th Cir. 1985) ...........................................34

*United States v. v. DeVegter*, 439 F.3d 1299 (11th Cir. 2006)........................ 52-56

*United States v. Falcone*, 960 F.2d 988 (11th Cir. 1992)......................................43

*United States v. Gonzalez*, 501 Fed.Appx. 851 (11th Cir. 2012) .........................45

*United States v. Hasson*, 333 F.3d 1264 (11th Cir. 2003) ....................................34

*United States v. Hill*, 745 Fed.Appx. 806 (11th Cir. 2018) ..................................54

*United States v. Landers*, 68 F.3d 882 (5th Cir. 1995)..........................................53

*United States v. Lopez*, 590 F.3d 1238 (11th Cir. 2009) ..................................27, 45

*United States v. Medina*, 485 F.3d 1291 (11th Cir. 2007)...............................28, 53

*United States v. Miles*, 360 F.3d 472 (5th Cir. 2004) ...........................................44

*United States v. Neff*, 10 F.3d 1321 (7th Cir. 1993) .................................46, 49, 51

*United States v. Nerey*, 877 F.3d 956 (11th Cir. 2017) ....................................31, 41

# TABLE OF CITATIONS, Continued

**Cases (Cont.)**                                                    **Page**

*United States v. Parker*, 839 F.2d 1473 (11th Cir. 1988)...............................30, 34

*United States v. Rivera-Santiago*, 107 F.3d 960 (1st Cir. 1997) ............... 46, 48-50

*United States v. Rodriguez*, 765 F.2d 1546 (11th Cir. 1985)................................45

*United States v. Ruan*, 966 F.3d 1101 (11th Cir. 2020)................................... 40-41

*United States v. Sepulveda*, 115 F.3d 882 (11th Cir. 1997)..................................53

*United States v. Sosa*, 777 F.3d 1279, 1293 (11th Cir. 2015) ..............................32

*United States v. Starks*, 157 F.3d 833, 838 (11th Cir. 1998)................................32

*United States v. Vernon*, 723 F.3d 1234 (11th Cir. 2013) ............................... 31-32

## **TABLE OF CITATIONS, Continued**

**Statutes and Rules**                                                          **Page**

18 U.S.C. § 371 ............................................................................. 34, 43-44

18 U.S.C. § 3231 ...................................................................................1

28 U.S.C. § 1291 ...................................................................................1

42 U.S.C. § 1320a–7b ......................................................................31, 43

11th Cir. R. 26-11 ..............................................................................C1

11th Cir. R. 28-1 ................................................................................58

Fed. R. App. P. 26.1 ...........................................................................C1

Fed. R. App. P. 28 ................................................................................1

Fed. R. App. P. 32 ..............................................................................58

U.S.S.G. § 2B1.1 .................................................................. 26, 52, 54-55

U.S.S.G. § 2B4.1 .................................................................... 52-56

## STATEMENT OF JURISDICTION

Under 28 U.S.C. § 1291, courts of appeal have jurisdiction over final decisions of the district courts, except where a direct review may be had in the Supreme Court of the United States.

The United States District Court, Middle District of Florida, Tampa Division, had jurisdiction pursuant to 18 U.S.C. § 3231. The district court entered its judgment on December 5, 2022. (Doc. 299.) Appellant Chun filed a timely notice of appeal on December 16, 2022. (Doc. 311.)

## STATEMENT OF ADOPTION

Pursuant to Federal Rule of Appellate Procedure 28(i), Appellant Chun adopts any non-adverse issues raised by co-appellant Daniel Tondre.

## <u>STATEMENT OF THE ISSUES</u>

I.      Whether the district court erred in denying a motion for judgments of acquittal on conspiracy and substantive charges of soliciting and receiving illegal remunerations when the charges stemmed from the Appellant's receipt of fees to serve as a speaker on behalf of a pharmaceutical company?

II.     Whether the district court invaded the province of the jury when the court, in answering two jury questions, directed the jurors to specific Government evidence and told the jurors that that evidence might answer their questions?

III.    Whether the district court erred at sentencing in calculating the net value of the benefit to have been incurred by the alleged illegal remunerations?

## STATEMENT OF THE CASE

### (i)    Course of Proceedings and Disposition in the Court Below

Appellant Steven Chun is a 60 year-old retired medical doctor with no criminal history. (Doc. 256:3.)  Dr. Chun worked in the medical field from 1997 until his retirement in 2019. (Doc. 256:15-16.)

Dr. Chun was charged with one count of conspiracy to solicit, receive, offer, and pay illegal remunerations; five counts of soliciting and receiving remunerations; and five counts of identification fraud. (Doc. 1, 67.)  The indictment alleged that he received payments to serve as a speaker on behalf of a pharmaceutical company in purported exchange for prescribing one of the company's medications. (Doc. 67.)  The substantive counts stemmed from speaker program dinners that took place on specified dates between March and June 2015. (Doc. 67:25-26.)

On May 9, 2022, the case proceeded to jury trial.  Prior to trial, the district court, on motion of the Government, dismissed three of the identification fraud counts. (Doc. 160, 183.)  The court later entered judgments of acquittal on the two remaining identification fraud counts. (Doc. 210.)  The jury rendered guilty verdicts on the conspiracy and substantive illegal remuneration counts. (Doc. 215.)

On December 5, 2022, the court imposed concurrent sentences of 42 months imprisonment and three years of supervised release on all counts. (Doc. 299.)

Dr. Chun filed a notice of appeal on December 16, 2022. (Doc. 311.)  He is on release pending appeal. (Doc. 342.)

**(ii)    Facts**

Dr. Chun was a well-respected physician who practiced in the pain-management field. (Doc. 237:18; 240:173.)  He had a large client base and received referrals from several other practitioners. (Doc. 237:18.)  A practitioner who had worked with Dr. Chun testified that Dr. Chun would only prescribe a medication if he knew it was the right medication for the patient. (Doc. 237:51.)

### A. Subsys' Entry in the Market

Based on the nature of his practice, Dr. Chun prescribed a relatively high-volume of prescriptions for Transmucosal Immediate Release Fentanyl ("TIRF") medications. (Doc. 234:106.)  The TIRF medications were frequently prescribed to treat breakthrough pain for which more common pain medications were ineffective. In March 2012, a new TIRF medication, Subsys, came on the market. (Doc. 328:186.)  Subsys was manufactured by Insys Therapeutics. (Doc. 328:186.)  Prior to that time, two other TIRF medications were typically prescribed to treat severe breakthrough pain: Actiq, which was administered via a lollipop, and Fentora, which was administered in a tablet that dissolved in a fizzing action. (Doc. 328:186.)

Subsys, in comparison, was administered via a spray that a patient sprayed under his or her tongue. (Doc. 234:268; 328:186.)  Subsys did not have various

4

adverse side effects that competing drugs Actiq and Fentora had. (Doc. 234:54.) Subsys was also faster acting than the comparable drugs, taking effect in five minutes, as opposed to 15 minutes. (Doc. 234:54, 119.) For those reasons, it was widely considered the best product in its class when it entered the market. (Doc. 234:54.)

From its inception, Dr. Chun preferred Subsys over Fentora and Actiq because he believed Subsys was safer than the comparable medications. (Doc. 234:58.) He also liked the fact that Subsys had better bioavailability than the comparable medications. (Doc. 234:58.) The sugar contained in the Actiq lollipop had, moreover, caused some of Dr. Chun's patients to suffer tooth decay. (Doc. 239:123.)

Dr. Chun regularly prescribed Subsys upon its release in March 2012. (Doc. 234:60-61.) He did not begin serving as a speaker in the Insys speaker program until after June 2012. (Doc. 234:61.)

## B. Insys' Speaker Program

After the roll-out of Subsys, Insys hired Alec Burlakoff to implement a speaker program that would utilize physicians as speakers to educate others on Subsys. (Doc. 234:102; 236:171.) The speaker program is a recognized, legitimate marketing strategy in the pharmaceutical industry. (Doc. 234:133.) Burlakoff had worked for Cephalon, the manufacturer of Actiq and Fentora, and had information on the highest volume prescribers of TIRF medications. (Doc. 234:116.) Burlakoff

and Michael Babich, the former CEO of Insys, proposed a speaker program plan to John Kapoor, the founder of Insys. (Doc. 234; 236:14-21.)  Insys' plan was to hire the 20 highest prescribing physicians to speak at program events budgeted for $100,000 annually. (Doc. 236:109.)  Burlakoff testified that Insys "targeted" the top prescribing physicians and did so without the physicians' knowledge. (Doc. 236:176.)

Babich testified that Insys knew it would be illegal to pay physicians to write Insys prescriptions so "[w]e thought if we did a -- made a veiled attempt at a speaker program, we would still be getting the checks in the hands of certain doctors in exchange for prescriptions." (Doc. 234:103.)  Babich provided that Insys "put all the things in place as a veil, meaning we were trying to put everything in place to make it look the right way." (Doc. 234:134.)  He further testified that "some sales reps and/or physicians [] did speaker programs very well and for the right reasons." (Doc. 234:135.)

Insys created standard operating procedures that were in compliance with applicable PhRMA guideline rules. (Doc. 236:173.)  The speaker fees that Insys paid were the fair market value for the respective speaker's service. (Doc. 236:175.)  All of the fees paid were reported to the government and pursuant to the Physician Payment Sunshine Act. (Doc. 236:175.)

As was the customary practice in the industry, sales representatives were responsible for advertising events and inviting attendees to speaker programs. (Doc. 234:79; 237:21.)  Speakers were not responsible for promoting events or inviting attendees. (Doc. 237:21-22.)  Sales representatives were also responsible for having attendees sign sign-in sheets to document their attendance at the speaker programs. (Doc. 237:22.)

Insys hired outside companies to administer the programs. (Doc. 236:47; 237:289.)  Burlakoff testified that Insys did so to "to give the appearance that we were trying to be responsible." (Doc. 236:47.)  Insys representatives would submit receipts of expenses and copies of the sign-in sheets to the administrating company after a speaker event. (Doc. 328:216.)  Speakers such as Dr. Chun were never responsible for preparing or submitting any of the materials to administrating companies. (Doc. 238:117.)

Insys put on speaker training programs to educate speakers on Subsys and to familiarize them with the speaker presentations. (Doc. 234:142; 236:122-23.)  Insys paid the speakers for attending those training sessions. (Doc. 234:142.)

Dr. Chun first entered into an agreement to serve as speaker for Subsys in July 2012. (Doc. 234:152.)  The contract he entered into with Insys stated, in relevant part:

> The parties agree that the compensation provided hereunder…is consistent with the fair market value of the services provided by speaker

under this agreement and will not be based upon the volume or value of any business generated between speaker and Insys with respect to Insys's products.

(Doc. 234:140.)  A subsequent contract that Dr. Chun entered into similarly stated that the speaker agreement would have no tie to the volume of prescriptions. (Doc. 239:178-79.)  Dr. Chun had two obligations under the contracts: to appear at speaker events and to be prepared to speak about Subsys. (Doc. 240:163.)

Dr. Chun was compensated $750 and paid travel expenses for attending an Insys speaker training. (Doc. 234:142; 236:122-23.)  Between 2012 and 2014, he was paid between $2400 and $3000 for each speaker event. (Doc. 234:143-45.)  In total, during his years serving as a speaker, Dr. Chun was paid $290,373 in speaker fees, training reimbursement and travel reimbursement. (Doc. 239:185.)[1]

Only a small percentage, an estimated 2.7%, of Dr. Chun's patients had prescription coverage under Medicare. (Doc. 239:269-72.)  During the relevant time period, from February 2013 through June 2015, Dr. Chun wrote Subsys prescriptions for 27 Medicare patients. (Doc. 239:255.)  During that time, he wrote 346 prescriptions for those patients, equating to a total amount that Medicare paid for Subsys prescriptions of $4,541,212. (Doc. 235:143-44.)

---

[1] At one point, Dr. Chun travelled to Phoenix with Aqsa Nawaz to meet with John Kapoor to pitch a business idea. (Doc. 234:178-81.)  Insys paid for their travel but did not ultimately undertake Dr. Chun's business proposition. (Doc. 234:178-80.)

8

Insys ended the speaker program in mid-2015. (Doc. 240: 85.)  Dr. Chun continued to write Subsys prescriptions after the speaker program ended. (Doc. 240:176-77.)  The case agent testified that he was aware of no evidence that Dr. Chun's Subsys prescriptions decreased after Insys stopped its speaker program. (Doc. 239:276.)

## C. Tracy Krane's Tenure as Sales Representative

Tracy Krane worked as a pharmaceutical sales representative at Insys between January and November 2012. (Doc. 328:182-83.)  Krane was assigned to cover a sales area in southwest Florida that encompassed Dr. Chun's practice.  (Doc. 328:188.)  Insys instructed Krane to target Dr. Chun because he was considered a "high decile" prescriber of TIRF medications, who Insys termed a "whale." (Doc. 328:188-89.)

Before Krane ever met Dr. Chun, Dr. Chun was already educated on Subsys and was prescribing it to patients. (Doc. 234:57-58.)  Krane made frequent visits to Dr. Chun's office and, as was common practice in the industry, often brought coffee or lunch for Dr. Chun and the office staff. (Doc. 328:204-05.)

During Krane's tenure, Insys hired Burlakoff. (Doc. 328:194.)  Krane testified that "[w]hen Alec Burlakoff became my manager, it was a 180-degree shift where we were encouraged to get as many speaker programs on the books or scheduled and make our top decile doctors our speakers." (Doc. 328:194.)  Krane testified that she

9

and Burlakoff first met with Dr. Chun in his office to discuss Subsys. (Doc. 328:195-96.) Burlakoff alleged that he had marketed to and gotten to know Dr. Chun years earlier when he worked for Cephalon. (Doc. 328:195-96.) Krane testified, however, that when they met with Dr. Chun, Chun didn't seem to know Burlakoff. (Doc. 328:196.)

When Krane first spoke with Dr. Chun about serving as a speaker for Insys, Dr. Chun felt that serving as a speaker was "beneath him." (Doc. 234:50.) Krane testified, however, Dr. Chun "liked the attention he was getting from Subsys and he liked being recognized as a leader in the field" and that he thereby elected to serve as a speaker. (Doc. 234:50.) Krane similarly testified that Dr. Chun was not serving as a speaker for the money. (Doc. 234:50.) On the contrary, she testified that "[h]e, in fact, indicated that he had more than enough money and that he didn't need it." (Doc. 234:50.)

A couple of months after she and Burlakoff met with Dr. Chun, the two arranged for a dinner with Dr. Chun and his girlfriend, Aqsa Nawaz. (Doc. 328:199.) At that dinner, Burlakoff discussed the Insys speaker program. (Doc. 328:199-200.) According to Krane, Dr. Chun was in favor of serving as a speaker by the end of the dinner. (Doc. 328:202.)

Krane went on to speaker events, between August and November 2012, with Dr. Chun as the speaker. (Doc. 234:78-79.) Dr. Chun came prepared to speak about

Subsys at all of those events. (Doc. 234:79.)  Krane testified that Dr. Chun was authoritative on Subsys, smart and experienced and that his speeches involved "his own experience in dealing with the drug over many years as he got comfortable with it." (Doc. 234:45-46.)  Dr. Chun would answer attendees' questions about Subsys whenever he was asked. (Doc. 239:38-39.)

Attendees at speaker events included oncologists, pain management doctors, pharmacists, and the staff of those practitioners. (Doc. 234:69.)  Several of the speaker events that Krane put on were well-attended, with as many as 13 attendees. (Doc. 234:8-9; 328:216, 225.)  At other events, only one practitioner might attend. (Doc. 234:74.)  Krane testified that such smaller events can still be legitimate educational programs. (Doc. 234:74.)  Krane likewise testified that it can be difficult to arrange for a large number of doctors on any given night. (Doc. 234:74.)  Even after the speaker events began, Krane continued to visit Dr. Chun's office on a frequent basis. (Doc. 234:80.)

When Subsys first came on the market, Insys provided coupons to physicians to pass along to patients to cover the costs of the medication. (Doc. 328:187.)  Krane testified that, throughout her time at Insys, Dr. Chun regularly provided his patients with coupons for Subsys. (Doc. 234:81.)  Insys was not happy with Dr. Chun's use of the coupons, however, because it lost revenue whenever coupons were used. (Doc. 234:81.)  At one point, Krane relayed Insys' concerns to Dr. Chun regarding the use

of the coupons. (Doc. 234:81.) Dr. Chun, nevertheless, continued to provide coupons to patients. (Doc. 234:81.) As of the time Krane left Insys, Insys was still displeased with Dr. Chun because he regularly provided coupons to patients and was not issuing as many Subsys prescriptions as Insys had hoped. (Doc. 234:82.)

In one email, Insys told Krane that it was dissatisfied that it hadn't seen any "super vouchers" from Dr. Chun. (Doc. 234:21.) The super vouchers were an indication that the physician had transitioned a patient from Actiq or Fedora to Subsys. (Doc. 234:21.) The company instructed Krane: "Nothing from Dr. Chun. This is the week, we will want to see him switching some patients. Please pack a lunch. You will be there all day." (Doc. 234:21.)

Krane testified that she believed there was no hope that Dr. Chun would prescribe any more Subsys than he was already prescribing. (Doc. 234:47-48.) Insys eventually terminated Krane, telling her that she wasn't getting Dr. Chun to write enough paid prescriptions. (Doc. 234:31.)

D. Daniel Tondre's Tenure as Sales Representative

Insys hired Daniel Tondre to serve in Krane's former position. (Doc. 234:33.) Tondre had a good relationship with Dr. Chun from Tondre's prior employment as a pharmaceutical representative. (Doc. 234:162.) Insys also later hired Aqsa Nawaz, Dr. Chun's then girlfriend who previously worked as a pharmacy technician. (Doc. 239:9-10, 100-01.)

12

While Nawaz was working at the Lakewood Ranch Pharmacy, she came to meet Insys employee Liz Guerrieri. (Doc. 239:15-16, 114.) Guerrieri worked in the Insys Reimbursement Center ("IRC") and was responsible for obtaining prior authorizations for Subsys, largely by misleading insurance companies to reimburse pharmacies for Subsys prescriptions. (Doc. 237:100-05.) Insys created the "IRC" to take the authorization "from the physicians and bring it in-house" so as to keep the physicians in the dark as to the authorization practices. (Doc. 237:187-88.)

In August 2013, Nawaz asked Guerrieri about obtaining a job at Insys. (Doc. 239:15-16.) Nawaz testified that she wanted to change employment in hopes of moving away from Florida and making changes in her personal life. (Doc. 239:117.) She specifically testified that she did not propose her relationship with Dr. Chun as a reason to be hired. (Doc. 239:117.) In an email Nawaz wrote to Guerrieri requesting a job, she stated:

> Dear Liz, thank you so much for helping me. It has been a rough couple years for me and I just want a fresh start. I just deserve so much better than what has been handed to me. If Insys had a job opportunity for me, I'd love to take it. I'd love to help the company grow. Anything anywhere will do…

(Doc. 236:75.) Guerrieri then contacted Burlakoff and stated that she had received a call from someone looking for a job but that that person did not want her name "discussed amongst certain people." (Doc. 236:187.) In September 2013, Nawaz

was offered a job at Insys as an Area Business Liaison. (Doc. 239:16-19.) Nawaz testified that her duties were to assist Tondre and try to increase sales. (Doc. 239:18.)

Babich and Burlakoff both testified that Insys hired Nawaz in hopes that her hiring would prompt Dr. Chun to possibly increase the volume of his prescriptions. (Doc. 234:183-84; 236:169.)

Nawaz estimated that, during her time at Insys, Dr. Chun served as a speaker about ten times per quarter. (Doc. 239:23.) Nawaz recalled a time when Dr. Chun expressed frustration over the number of attendees at events and stated to Tondre:

> Dan, no one is coming to these events. Why aren't you inviting people? And that made -- and that mainly was -- it was invite other physicians that you're calling on to come to these dinners so they can get educated and hopefully start writing the product.

(Doc. 239:27, 63-65.)

Nawaz resigned in April 2014, stating as her reasons: "I thought the results they wanted were just highly unachievable. I thought they were too pushy. They were expecting too much." (Doc. 239:57, 65.) She elaborated in her testimony: "Like that e-mail that came from whoever that said, where is Dr. Chun, he's not where he needs to be. I couldn't control Dr. Chun. I don't have a say in what he writes and what he doesn't, so the expectations were just unrealistic for me." (Doc. 239:57.)

Nawaz testified that she was not aware of any plan to use the speaker program to influence Dr. Chun's prescription writing. (Doc. 239:158-59.) She ultimately

testified that Dr. Chun was a confident doctor and that he would do what he wanted to do as a doctor regardless of what Insys wanted. (Doc. 239:121-23.)

After Nawaz left, Insys hired Andre Rosado to serve in the same position Nawaz had held. (Doc. 237:249.)  Rosado testified that Dr. Chun was "supremely smart" and believed in Subsys. (Doc. 238:123.)  He likewise testified that Dr. Chun "loved educating other people, in or out of the programs, like he would talk to anybody about -- about making patients' care better." (Doc. 238:123-24.)

Rosado testified that one of the reasons he was hired was to increase the number of attendees at speaker programs. (Doc. 238:122.)  Rosado, like Nawaz, recalled instances in which Dr. Chun was frustrated by the attendance and wanted additional attendees at presentations. (Doc. 238:122.)

Rosado confirmed that the sales representative was solely responsible for confirming the number of attendees and for cancelling an event if not enough attendees were scheduled to attend. (Doc. 238:118-19.)  Rosado estimated that at approximately four events, members of Dr. Chun's family or other non-prescribers attended the events. (Doc. 237:292.)  He testified that attendance of non-prescribers was "not allowed." (Doc. 237:292.)  On cross-examination, Rosado could not point to any such rule having been reduced to writing, but alleged that it was "reinforced over an over" within Insys. (Doc. 238:128.)

Rosado testified that Tondre ran the events in a "haphazard, slapdash kind of way." (Doc. 237:289.)  He alleged that there was an educational component at "less than a majority" of the events and that some were "just dinner." (Doc. 238:23, 34.)

Rosado gave the following testimony during trial:

So the relationship was the more Dr. Chun wrote, the more prescriptions, the bigger the prescription, the more money Dan would get, and Dr. Chun got about $3,000 a pop for the dinner.
Q So do you know -- how did you know of this direct correlation between being a speaker and writing more Subsys?
A It was a topic of frequent conversation in and outside of Dr. Chun's presence.

(Doc. 237:282.)

Rosado recalled that he thought that Insys' Speaker Program guidelines required six attendees at a speaker event. (Doc. 237:287.)  The receipt for the number of meals was supposed to correspond to the number of attendees. (Doc. 237:287.) At some speaker events, attendees, to include Dr. Chun, would take food to go after the program. (Doc. 240:117.)

Rosado also recounted that, when an insufficient number of attendees appeared, he and Tondre cut and pasted signatures on sign-in sheets. (Doc. 237:291.) When family members attended, Rosado testified that their names were placed on the sign-in sheets with titles such as "office staff member" or "office manager." (Doc. 237:292-94.)  Rosado did not allege that Dr. Chun had knowledge of, nor took part in the forging of sign-in sheets.

16

Rosado was later fired from Insys for having stolen funds from Tondre. (Doc. 238:75-78.)

## E. <u>Various Other Government Witnesses</u>

At trial, the Government called various practitioners to testify that their signatures appeared on sign-in sheets for speaker programs that they had not attended. (Doc. 235:12-19, 73-77, 208-25; 236:248-61; 237:10-15, 34-36, 41-47; 238:8-13, 152-58, 209-16.)   Some of those practitioners had attended speaker programs on other dates and some had not. (Doc. 235:12, 33, 71-72, 203-06; 236:244-46; 237:9, 34; 238:8-10, 148-51, 206-08.)

One physician testified that the speaker events he attended were small groups that did not include a formal presentation and did "not really" have an educational component. (Doc. 235:33-34.)  The physician did, however, speak with Dr. Chun at the speaker program dinners and communicated with him afterwards. (Doc. 235:36, 45-53.)  That physician testified that he may have also referred patients to Dr. Chun after the speaker events. (Doc. 235:50-53.)

Another physician who had attended speaker events testified that they were held in an open setting and that he did not recall an educational component. (Doc. 235:71.)  He did recall, nonetheless, attending with other physicians. (Doc. 235:71-72.)  He also could not testify that Dr. Chun was not speaking about Subsys to the practitioners in attendance. (Doc. 235:81.)

Other practitioners testified that certain presentations included an educational component. (Doc. 235:229; 237:60; 238:148, 207-08, 221.)  Various attendees testified that Dr. Chun spoke with other physicians in attendance about Subsys and advised on when and how it should be prescribed. (Doc. 235:229.)  One attendee described the speaker programs as good networking events. (Doc. 235:230.)  Another attendee testified that the programs provided a basis for practitioners to "bounce ideas off one another" and to grow as physicians. (Doc. 237:23.)  Yet another attendee testified that many events included multiple-time attendees because of the networking benefit. (Doc. 238:149-51.)  That practitioner had attended 10 to 15 events and recalled that the events always had an educational component. (Doc. 238:163-64.)

The Government also called as witnesses owners or employees of various restaurants where speaker events had been held to generally testify that the restaurants and/or conditions in which certain dinners were held were not allegedly conducive to speaker events. (Doc. 237:80-98, 229-247; 238:224-230.)

The Government additionally called Michael Frey, a former physician who had been convicted of two fraud-related charges stemming from kickback schemes tied to medical braces and pain creams. (Doc. 238:233, 257, 261-68.)  Neither of the charges Frey pled guilty to were related to Insys. (Doc. 238:266-67.)  Frey had, however, participated in the Insys speaker program. (Doc. 238:237.)  Frey testified

that when he began speaking for Insys he believed the program to be a legitimate speaking program that had no tie to prescription volume. (Doc. 238:246.)  Frey, for his part, was later paid speaker fees for events he never attended. (Doc. 238:270.)  Frey had met Dr. Chun at the Insys speaker training. (Doc. 238:255.)  He alleged that, at the speaker training, Dr. Chun had stated to him and one or two other physicians that he was the highest paid speaker in the country because of his prescription writing volume. (Doc. 238:255, 260.)

### F. Government Witnesses Alec Burlakoff and Michael Babich

Alec Burlakoff alleged at trial that "I engaged in a relationship to pay -- well, first, to allocate speaker budget to Dan Tondre so that he would pay Dr. Chun to speak as an avenue for us to receive prescriptions of Subsys in return, and I ultimately paid Dr. Chun through the allocation of budget that I had, again, in exchange for his prescribing of Subsys." (Doc. 235:241.)  Burlakoff had only, however, had contact with Dr. Chun on two to three occasions during Burlakoff's employment with Insys, to include the aforementioned dinner with Tracy Krane. (Doc. 236 at 184.)  Burlakoff testified of his reasons for scheduling that dinner:

> A No, it's just that I want to know -- - I knew I couldn't -- I couldn't influence Dr. Chun, that was just my take. I mean, I've met many customers. I wanted to spend my time with doctors that I thought I could influence.
>
> Q And so when you went to that dinner, you knew that you were not going to be a deciding factor in Dr. -- with Dr. Chun, correct?

A I had to take a shot. I mean, I never count myself out, but, you know, as evidenced by the fact that after that we did not see a robust response, eventually I knew that, you know, yeah, I wasn't going to be the guy.

Q Okay. So at that meeting there was no agreement that he was going to do anything for you quid pro quo?

A I mean, he said he would -- he said he would do it, but doctors say that all the time. I mean, just because you get a verbal commitment doesn't mean that it's going to happen, that's just the nature of the business, but it's a numbers game. If I present that to 50 doctors and five actually follow through, then, you know, I'm in good shape.

(Doc. 236:201.)

Burlakoff testified that he was not present for and had no first-hand knowledge of any communications to Dr. Chun that he was expected to prescribe in exchange for speaker fees. (Doc. 236:177-78.) Burlakoff also did not recall having any conversations with Dr. Chun about Medicare. (Doc. 236:202.) Burlakoff, furthermore, never had phone, text message, or email communications with Dr. Chun. (Doc. 236:184-85.) Burlakoff conceded that he "did not have a great relationship with Dr. Chun." (Doc. 236:47.)

As to the volume of prescriptions Dr. Chun wrote, Burlakoff sent an email to Insys employees on October 3, 2013, stating:

Where is Dr. Chun? Not even close to meeting anyone's expectations thus far. Perhaps we have failed in setting our expectations, question mark. We are looking to go from 40 percent market share to 90 percent. Dan, please do not respond with a 5 page e-mail bashing me. I have to sit in the corporate office and answer these questions face-to-face. It's not fun -- it is not fun, and the recent move we made on an ABL appears as if it is potentially not worth it.

(Doc. 234:188-89; 236:85-86.)

At another point, Burlakoff sent a similar email stating:

Hey, guys. Where is Dr. Chun? We cannot go a single day without a prescription from Dr. Chun. I do not want to hear excuses. We pay good money here. We need one a day from Dr. Chun.

(Doc. 236:54.)

Michael Babich similarly testified that he never told Dr. Chun that he expected to see prescriptions written in exchange for speaker program fees. (Doc. 234:145-46.) He likewise testified that he never discussed kickbacks with Dr. Chun, nor did he ever tell Dr. Chun that he was paying for Subsys prescriptions to be written. (Doc. 234:181, 218.) Babich testified that he did not personally conspire with Dr. Chun. (Doc. 234:201.) Babich also recalled that Dr. Chun had touted his record-keeping. (Doc. 234:183.)

Babich was aware of other doctors serving in the speaker program who would show up to programs with no attendees, take food, and leave. (Doc. 234:208.) He did not, however, know of Dr. Chun to have ever done so. (Doc. 234:208.) Babich was also aware of doctors in the speaker program who would tell their sales representatives, to effect, "if you don't pay me, I'm not writing anymore Subsys prescriptions." (Doc. 234:208.) Babich did not know of Dr. Chun having done anything of that sort. (Doc. 234:208.)

In the end, Dr. Chun never prescribed the volume of Subsys prescriptions that Insys desired to see him write. (Doc. 234:188.)  As Babich testified "internal expectations…were never met" with respect to Dr. Chun. (Doc. 234:188.) According to him, Insys received "nowhere near" the volume of prescriptions it had hoped for from Dr. Chun. (Doc. 234:244.)

### G. Daniel Tondre's Testimony

After the Government's case, Daniel Tondre testified.  Tondre testified that he used many different methods to invite practitioners to speaker programs, including visiting offices, making phone calls, sending text messages and emails, dropping off flyers, and orally inviting practitioners. (Doc. 240:61.)  He frequently had doctors commit to going to an event, only to have them cancel at the last minute or simply not show up. (Doc. 240:66, 116, 163.)  Tondre testified that he typically did not know ahead of time if attendees would show or not. (Doc. 240:147.)

Tondre additionally testified that, on several occasions, Dr. Chun was angry with him because they would show up for an event and have only a small number of attendees. (Doc. 240:147, 164.)  Dr. Chun viewed the lack of attendees as an insult. (Doc. 240:164-65.)  As Tondre described Dr. Chun's desire to attend speaking programs: "I mean, he's a man that lives with his mom, he takes care of her, she's elderly, he doesn't get to do a lot of things, so it's a time for him to be able to speak with other professionals that he enjoys speaking to." (Doc. 240:165.)

Tondre testified that he had foolishly cut and pasted signatures on the sign-in sheets when not enough practitioners attended. (Doc. 240:121.) He testified that he did so because of the pressure that was on him to carry out the speaker programs. (Doc. 240:121.) He additionally testified that Dr. Chun never participated in the sign-in sheet forgeries and had no idea that he and Rosado were fabricating signatures. (Doc. 240:166-67.)

Tondre had also told Insys executives that speaker programs would not impact the number of prescriptions Dr. Chun would write:

> I kept telling Alec, I kept telling Karen, I kept telling Joe, look, Dr. Chun is going to write what he wants to write for his patients, you're not going to influence this person, who is wealthier than most people can want to be and doesn't even have to work at this point, to write prescriptions unless it's a benefit to his patients.
>
> The man has a pedigree that's beyond most doctors that are out there. You can't even find an expert that's got more degrees and pedigree than him.

(Doc. 240:77.)

## H. Motion for Judgments of Acquittal

At the close of the evidence, Dr. Chun moved for judgments of acquittal. (Doc. 240:275-81.) With respect to the conspiracy and illegal remunerations counts, he asserted that the Government failed to present sufficient evidence to prove the requisite Medicare element. (Doc. 240:279-80.) He additionally asserted that the

23

evidence failed to prove the existence of any agreement between him and Insys to carry out any illegal act. (Doc. 240:279-81.)

The Court denied the motion as to those counts, but granted the judgments of acquittal on the identity theft counts. (Doc. 210; 240:282.)

## I. Closing Arguments Concerning Text Messages

During closing arguments, the Government made the following argument concerning imaging from Tondre's phone:

> …The text messages from Dan Tondre's phone start in September of '13, and they include these two texts forwarded from Chun on September the 18th of 2013. These are clearly forwarded from Chun. You already got 1600 MCGs times nine, sending that to his boss to let him know that the writing was going on. And then Dr. Chun tells him, this morning I'm looking for Subsys patients. Those sound like incriminating texts. And where is the original text from Dr. Chun on or about, on or around 9-18-2013? They're not there.

> Out of the more than 1,000 texts from 2013, we find these two texts forwarded from Chun, but you certainly see no texts from Chun in 2013, a further coverup by Dan Tondre of his communications...

(Doc. 241:55-56.)  The Government had moved the text message evidence into evidence but had not addressed the two allegedly "forwarded" text messages during the trial. (Doc. 253-1570, 253-1580, 253-1582.)  The Government presented no evidence that the text messages at issue were forwarded from Dr. Chun.  Thereafter, in the Government's rebuttal argument, it again referenced the text messages from Tondre's phone and alleged that they had been forwarded from Dr. Chun. (Doc. 241:139-40.)

J. Jury Questions

On the first day of deliberations, the jury posed a question as follows:

Dear Judge, We would like to review any data from which we can calculate the per unit cost (not PDE) of the various strengths of Subsys to compare how much 1 x 600 mcg or 1 x 800 mcg costs compared to 0.5 x 1200 mcg or 0.5 x 1600 mcg.

(Doc. 217:2.) The Government proposed that the Medicare data was contained on Government Exhibits 600 and 600-A. (Doc. 241:170.) The Government later added, however, that the data contained in those exhibits was PDE and noted that the jury had stated that it was seeking non-PDE calculations. (Doc. 241:173-74.) The defendants argued that the exhibits the Government sought to refer to did not provide the information the jury was asking for. (Doc. 241:174.)

Over that objection, the court provided the following answer, in relevant part:

Re. your note: You might consult Govt. Exhibit 600 & the excerpt 600A. A laptop will be provided in the morning to view CDs. You may or may not find these exhibits helpful...

(Doc. 241:174-78.)

On the second day of deliberations, the jury posed the question:

We, the jury are requesting the exhibit number associated with a text message from defendant Tondre in 2013 in which he 'forwards' in part a direct message purportedly from defendant Chun and whose original message is not present in evidence.

(Doc. 217:5.) The court concluded, with the Government's input, that the messages the jury was referring to were Government Exhibits 212B, 213B, and 213D, which

appeared to be the messages that the Government referred to in the closing argument. (Doc. 242:3-5.)  The Defense argued that the Government presented no evidence that the text messages were forwarded messages. (Doc. 242:5-6.)  It additionally asserted that it was unclear which exhibits the jury may have been asking about because the evidence did not include any forwarded text messages whatsoever. (Doc. 242:8.)

Dr. Chun objected to the jury being instructed in any more detail than to answer, "you have to rely on your memory and the evidence that's in the jury room." (Doc. 242:9.)  Over Dr. Chun's objection, the court answered "Per your note: You may be referring to Exs. 212B, 213B, and 213D??  Please consider all the evidence as a whole..." (Doc. 217:6.)

Shortly thereafter, the jury rendered guilty verdicts. (Doc. 215.)

## K. Sentencing

At sentencing, Dr. Chun objected to the Presentence Report's proposed calculation of the Sentencing Guidelines "loss amount." (Doc. 344:17-21.)  The PSR proposed a loss amount of $4,541,212 pursuant to the loss table in Section 2B1.1 (Doc. 256:9-11.)  The loss amount represented the total amount Medicare paid for Subsys prescriptions written by Dr. Chun during the relevant time period. (Doc. 256:9.)

26

Dr. Chun set out that the loss should be the amount of the alleged bribes. (Doc. 344:18.) He additionally asserted that the actual loss amount to Medicare was zero because the evidence did not indicate that any of the prescriptions at issue were not medically necessary. (Doc. 344:18-19.)

The district court posed the question of whether the improper benefit conferred would still be the amount that Insys received as a result of illegal payments. (Doc. 344:21.) Dr. Chun answered that, even in that scenario, the amount Insys received would need to be discounted by the amount that Medicare would have paid for corresponding prescriptions of comparable medications. (Doc. 344:21.)

The district court overruled the objection and imposed sentences as discussed above. (Doc. 344:24-25, 59.)

This appeal follows.

## (iii) **Standards of Review**

As to Issue I, this Court reviews *de novo* a district court's denial of a motion for judgment of acquittal. *United States v. McCrimmon*, 362 F.3d 725, 728 (11th Cir. 2004).

As to Issue II, this Court reviews a district court's response to a jury question for abuse of discretion. *United States v. Lopez*, 590 F.3d 1238, 1247 (11th Cir. 2009).

As to Issue III, this Court reviews a district court's determination of the applicable Sentencing Guidelines loss amount for clear error. *United States v. Medina*, 485 F.3d 1291, 1297 (11th Cir. 2007).

## SUMMARY OF THE ARGUMENTS

Dr. Chun was a pawn and victim of the Insys speaker program conspiracy. The Government presented no competent evidence to permit an inference that Dr. Chun entered into any quid pro quo agreement to prescribe Subsys in exchange for his service as a speaker.  Dr. Chun issued a high volume of medically necessary Subsys prescriptions before, during, and after serving in the speaker program.  The Government presented no evidence that Dr. Chun acted willfully with specific intent to do anything illegal when he served as a speaker on behalf of Subsys.  It likewise presented no evidence that Dr. Chun knowingly and voluntarily entered into an agreement with Subsys to violate the law.

Notwithstanding the insufficiency of the evidence, the district court invaded the province of the jury in its answers to the two jury questions.  The court's answers to the questions went beyond merely reinstructing the jury on a point of law or permitting the jury to rehear evidence.  The answers helped plug holes in the Government's case and specifically directed the jury to various Government evidence that it could purportedly use to answer its two vague questions.

At sentencing, the district court additionally erred in determining the applicable Sentencing Guidelines range because it made no attempt to calculate the *net* value of the benefit to be conferred by the alleged kickbacks and, instead, merely relied on the total amount that Medicare paid out.

## ARGUMENTS AND CITATIONS OF AUTHORITY

## I.

### THE DISTRICT COURT ERRED IN DENYING DR. CHUN'S MOTION FOR JUDGMENTS OF ACQUITTAL BECAUSE THE GOVERNMENT FAILED TO PROVE SEVERAL OF THE NECESSARY ELEMENTS OF THE CHARGES.

Dr. Steven Chun was a target and victim of the Insys speaker program conspiracy. The evidence presented at trial was insufficient to prove that he knowingly and willfully participated in that conspiracy. As to both the substantive and conspiracy counts, the evidence failed to prove that Dr. Chun acted willfully and with any specific intent to do something that the law forbids. Unlike some other physicians who participated in the scheme, Dr. Chun never altered his prescription writing as a result of being paid to speak on behalf of Subsys. Dr. Chun appeared for and ready speak at every event that he was paid to speak at. Before, during, and prior to the Insys speaker events, Dr. Chun wrote a high volume of medically necessary TIRF prescriptions, to include Subsys, based on the nature of his practice. The Government simply presented no evidence to establish that Dr. Chun ever entered into any agreement to prescribe Subsys in exchange for serving as a speaker.

This Court has held that it will reverse a conviction if it finds that "a reasonable mind must entertain reasonable doubt about the guilt of the defendants." *United States v. Parker*, 839 F.2d 1473, 1477 (11th Cir. 1988). Dr. Chun recognizes that establishing the insufficiency of the evidence is a heavy burden to bear. The

instant case is, however, one of those relatively rare cases in which the evidence, even when viewed in a light most favorable to the Government, is insufficient to sustain the convictions.

A. <u>The Government Failed to Prove the Substantive Counts Because the Evidence was Insufficient to Show that Dr. Chun Acted Willfully and With Specific Intent to do Something the Law Forbids</u>

To prove the substantive charges of violating the "illegal remunerations" statute, which is commonly referred to as the Anti–Kickback statute, the Government was required to prove that Dr. Chun:

(1) knowingly and willfully
(2) received any remuneration (including any kickback or bribe) directly or indirectly, openly or secretly, in cash or in kind;
(3) that was given at least in part in return for purchasing, ordering, arranging for, or recommending purchasing or ordering of a good, service, or item
(4) that could be paid for, in whole or in part, by Medicare

See 42 U.S.C. 1320a-7b(b)(1); *United States v. Nerey*, 877 F.3d 956, 968 (11th Cir. 2017) *citing United States v. Vernon*, 723 F.3d 1234, 1252 (11th Cir. 2013); Doc. 214:16. "Willful conduct under the Anti–Kickback statute means that the act was 'committed voluntarily and purposely, with the specific intent to do something the law forbids, that is with a bad purpose, either to disobey or disregard the law.'" *Nerey*, 877 F.3d at 969 *quoting Vernon*, 723 F.3d at 1256. While "the Defendant need not have known that a specific referral arrangement violated the law," he must have still had that "specific intent to do something the law forbids." *United States v.*

*Sosa*, 777 F.3d 1279, 1293 (11th Cir. 2015) *quoting Vernon*, 723 F.3d at 1256 (quoting *United States v. Starks*, 157 F.3d 833, 838 (11th Cir. 1998).

Based on the evidence presented at trial, reaching the conclusions that Dr. Chun knowingly and willfully participated in Insys' illegal scheme required an impermissible stacking of inferences stemming from Dr. Chun's attendance at the Insys speaker events. For the substantive counts, the Government relied primarily on the forged sign-in sheets and the fact that listed attendees had testified that they did not attend the respective speaker events. The unrefuted evidence established, however, that Dr. Chun was not aware, ahead of time, of who or how many people would be attending a speaking event. Dr. Chun, furthermore, had no responsibility for marketing speaker events or securing attendees for the events. The evidence in fact established that Dr. Chun was frequently frustrated and offended by the lack of attendees. The evidence even more critically established that Dr. Chun had no role in forging or submitting forged sign-in sheets. His responsibilities were to appear and be ready to speak on behalf of Subsys at any events he was scheduled to speak at. He always fulfilled those duties.

Aside from the sign-in sheets, the Government relied on testimony from restaurant employees that, as to two of the respective dinners, the dinners were held under conditions there were not generally conducive to a speaker event. Neither of those individuals were, however, privy to the conversations that occurred among the

attendees to know if Subsys was discussed during the events. Likewise, neither could say what was occurring during the speaker events. Most importantly, the evidence nevertheless established that Dr. Chun had no role in organizing any of those events.

In the end, the Government presented scant evidence concerning the substantive remunerations offenses. It, instead, seemed to rely on the allegations encompassed in the conspiracy charge to bootstrap its proof on the substantive counts. The Government did not present any evidence linking Dr. Chun to the planning of the events at issue nor to the forged sign-in sheets. On the contrary, the Government's own evidence established that Dr. Chun had no knowledge of the sign-in sheet forgeries. The district court, to be sure, seemingly recognized the lack of proof when it entered judgments of acquittal as to the identification fraud charges alleged against Dr. Chun.

As will be discussed in greater detail in the subsection to follow, Dr. Chun's service as a speaker did not alter his prescription writing practices. The evidence, moreover, was insufficient to permit even an inference that Dr. Chun served as a speaker for Insys in exchange for writing Subsys prescriptions. Reaching such a conclusion requires pure speculation. While Insys certainly acted willfully with the specific intent to do something the law forbids, Dr. Chun never did. Dr. Chun was paid a fair market fee to speak on behalf of Insys. He, likewise, appeared at every

speaker event ready to speak about and educate others on Subsys. He prescribed Subsys prior to, during, and after the time he served as a speaker. The record is devoid of any evidence that Dr. Chun, in serving as a speaker for Insys, had specific intent to do anything illegal.

B. <u>The Government Similarly Failed to Prove that Dr. Chun<br>Conspired to Violate the Anti-Kickback Statute</u>

With respect to the charge of conspiracy to commit an offense or to defraud the United States, the offense requires proof of "(1) an agreement among two or more persons to achieve an unlawful objective; (2) knowing and voluntary participation in the agreement; and (3) an overt act by a conspirator in furtherance of the agreement." *United States v. Hasson*, 333 F.3d 1264, 1270 (11th Cir. 2003) *citing United States v. Adkinson*, 158 F.3d 1147, 1153 (11th Cir. 1998); *see also* 18 U.S.C. § 371. Proof of an express agreement to commit a fraud is not required and the existence of a conspiracy "may be inferred from the actions of the actors or by the circumstantial evidence of a scheme." *Parker*, 839 F.2d at 1478 *quoting United States v. Cole*, 755 F.2d 748, 755 (11th Cir. 1985). The Government must, however, "prove the existence of an *agreement* to achieve an unlawful objective and the defendant's *knowing* participation in that agreement." *United States v. Chandler*, 388 F.3d 796, 805-06 (11th Cir. 2004) *citing Adkinson*, 158 F.3d at 1155.

1. <u>The Evidence was Insufficient to Permit a Finding that Dr. Chun Knowingly and Voluntarily Participated in an Unlawful Agreement</u>

Dr. Chun began serving as a speaker for Subsys only after he had already begun prescribing Subsys. He similarly began serving as a speaker after concluding, like many others in the field, that Subsys was the superior TIRF medication on the market. To be sure, the Government's own evidence established that Subsys had numerous advantages over comparable TIRF medications. While Dr. Chun's Subsys prescriptions may have increased as he served as a speaker for Subsys, the increase in prescriptions was commensurate with Subsys having been new to the market and having been gradually accepted as a replacement medication for patients who were already taking TIRF medications prior to Subsys' inception. Notably, Dr. Chun's Subsys prescriptions remained relatively steady and consistent during and after the time he served as a speaker.

The evidence established that Dr. Chun entered into a detailed written agreement to serve as a speaker for Subsys. The text of that contract expressly stated that the speaker fees were not being issued in exchange for prescription writing. Babich and Burlakoff likewise testified that Insys' speaker program was created to appear legitimate. Insys, indeed, took steps to keep physicians such as Dr. Chun in the dark and to make the speaker program appear legitimate. While Babich and Burlakoff attempted to elude to having some sort of ethereal unspoken agreement with Dr. Chun, neither had any actual communication with Dr. Chun that they were

expecting, or that Dr. Chun was agreeing, to issue prescriptions in exchange for serving as a Subsys speaker. While Insys undoubtedly hoped that Dr. Chun would issue more Subsys prescriptions if he served as a speaker, one-sided intent cannot create a conspiracy.

Insys' behavior further indicated that Dr. Chun did not knowingly and willfully participate in Insys' conspiracy. Internally, Insys executives emailed employees stating that Dr. Chun's prescription volume was too low. It correspondingly exerted intense pressure on its representatives to try to increase Dr. Chun's prescription volume – pressure so great that two of the representatives left the company. The evidence likewise established that Insys continued putting on speaker events and directed its representatives to visit Dr. Chun's office despite the fact that Dr. Chun was not meeting Insys' internal expectations. If, however, Insys had been in a quid pro quo agreement with Dr. Chun, it could have simply told him directly to issue more prescriptions and/or cut off his speaker events. Insys never took any such actions.

In the end, the Government presented no competent evidence to permit an inference that Dr. Chun entered into any quid pro quo agreement with Insys. It did, on the other hand, present numerous evidence of bad acts on the part of Insys that never connected back to Dr. Chun. Those bad acts included Liz Guerrieri's acts in obtaining prior authorizations. As Guerrieri testified, however, Insys intentionally

36

hid those practices from physicians such as Dr. Chun. The Government similarly presented evidence that Insys hired Aqsa Nawaz in hopes of increasing Dr. Chun's prescriptions. While that may have been *Insys'* intent in hiring Nawaz, the evidence established that Nawaz sought out a job with Insys on her own, that she asked to be assigned out of Florida, and for "certain people" not to know. Finally, with respect to Dr. Frey, Frey was a corrupt doctor who committed numerous frauds unrelated to Insys. While the Government seemingly appeared to juxtapose Frey with Dr. Chun, Frey's testimony gave no indication that Dr. Chun entered into a quid pro quo agreement with Insys as Frey had. Even assuming, as required under the applicable standard of review, that Frey was truthful when he said that Dr. Chun boasted of having been the highest paid speaker as a result of his TIRF prescription volume, that statement was not indicative of any quid pro quo agreement. Indeed, Dr. Chun was one of highest-volume prescribers in the country long before the speaker program – that was the very reason Insys targeted him.

While the Government presented a plethora of evidence of illegal acts that Insys carried out, it presented no evidence that Dr. Chun ever conspired with Insys. As numerous witnesses testified, Dr. Chun put his patients first and would not alter his practices based on any outside influence. The evidence simply did not establish any correlative connection between Dr. Chun serving as a speaker and issuing medically necessary prescriptions of Subsys. Again, while Insys may have been

carrying out a conspiracy, it was doing so without Dr. Chun's knowing and willful participation.

2. The Evidence in the Instant Case was Far Different from the Evidence Presented Against Defendants who Faced Similar Allegations

The evidence the Government presented concerning Dr. Chun paled in comparison to evidence that court have found to sustain illegal remunerations convictions against defendants who were facing similar allegations. The First Circuit, for instance, reviewed the sufficiency of the evidence in an illegal remunerations case lodged against a provider who served in the Insys speaker program. *United States v. Clough*, 978 F.3d 810 (1st Cr. 2020). The *Clough* defendant was a licensed physicians assistant who, in his home state of New Hampshire, was permitted to issue prescriptions. *Id*. at 813 n.5. The defendant had never prescribed Subsys until one day when he "inherited from a departing physician a patient who needed a refill of his prescription for Subsys." *Id.* at 813-14. An Insys pharmaceutical representative attended the defendant's appointment with that client to educate the defendant on Subsys. *Id.* at 814. On the day that he issued that first prescription, the defendant told the representative that he "wanted to join the speaker program, so long as he was paid 'doctor money.'" *Id.* at 818. The representative told the defendant that he could not serve as a speaker unless he prescribed Subsys to multiple patients in different dosages. *Id.* As the First Circuit described it, the defendant, in response "stepped up his prescription-writing prowess. In a matter of

weeks, he had gone from having just learned about Subsys, and having only rarely prescribed other fast-acting fentanyl drugs in his career, to writing up copious Subsys scripts." *Id.*  The Insys representative testified that she and the defendant "had a 'mutual understanding that if [he] write[s more] prescriptions [for Subsys], [he]'ll get more speaker programs.'" *Id.*  When the defendant began serving in the speaker program, he, in contrast to Dr. Chun, was frequently informed ahead of time that no attendees would be attending a speaker event. *Id.* at 815.  In further contrast to Dr. Chun, the defendant would then, himself, forge signatures of colleagues on the sign-in sheets. *Id.*  In addition, as the events went on, the representative expressly told the defendant "that Insys was 'so happy that you've been writing a lot of their drug, so in return, we're going to give you some more speaker programs,' and 'I just need a few more patients and I can get you a few more programs.'" *Id*. at 820.

As to the prescriptions he issued, the *Clough* defendant, in stark contrast to Dr. Chun, issued medically unnecessarily Subsys prescriptions and even refused to change medications for patients who suffered adverse side effects from Subsys. *Id.*  From there, when the FBI began investigating the defendant, the defendant lied to the FBI "about his interactions with Insys and about his prescribing habits for Subsys." *Id.* at 819.  Based on that evidence, the First Circuit concluded "Clough's aberrant behavior was not reminiscent of a physician assistant prescribing based on need, but rather of a drug pusher -- one who voluntarily furthered the conspiracy by

knowingly and willfully enriching Insys at the expense of the U.S. Government in exchange for kickbacks through sham speaking engagements." *Id.* at 821.

In *United States v. Ruan*, this Court also reviewed the sufficiency of the evidence against other practitioners who participated in the Insys speaker program. *United States v. Ruan*, 966 F.3d 1101 (11th Cir. 2020) *vacated on other grounds by Ruan v. United States*, --- U.S. ---, 142 S.Ct. 2370, 213 L.Ed.2d 706 (2022). In contrast to Dr. Chun, the *Ruan* defendants were charged with numerous offenses in addition to illegal remunerations charges, to include racketeering, health care fraud, wire and mail fraud, and controlled substances charges. *Id.* at 1120. The *Ruan* defendants, unlike Dr. Chun, ran a "'pill mill,' which prescribed controlled substances for no legitimate medical purpose or outside the usual course of professional practice." *Id.* The defendants issued medically unnecessary prescriptions for millions of doses of opioids and other controlled substances. *Id.* at 1122. In addition to issuing medically unnecessary prescriptions, the defendants also misused their pharmacy, prescribed opioids to patients they had not seen, failed to keep accurate records of prescriptions, wrote specific prescriptions that were illegal, engaged in numerous frauds, and laundered proceeds of their illegal activities. *Id.* at 1122-32. With regard to their participation in the speaker program, this Court found that the Government presented sufficient evidence to sustain convictions for conspiracy to violate the Anti-Kickback Act. *Id.* at 1146. In reaching

that holding, the Court relied, for one, on the fact that Insys reduced, but did not stop, the number of speaker programs for the defendants when the defendants' volume of Subsys prescriptions decreased. *Id.* at 1125, 1146. The Court additionally relied on the fact that one of the defendants showed consciousness of guilt when he arranged to donate the proceeds of his Insys speaker fees the day after learning that a physician in Michigan was indicted. *Id. see also Nerey*, *supra*, 877 F.3d 956 (finding the defendant acted willfully in receiving kickbacks and conspiring to defraud the United States in case where inflated invoices were submitted to Medicare for services that were medically unnecessary or were never performed at all, the defendant "sought cash payments to avoid a paper trail," "attempted to funnel his kickbacks through [a co-conspirator] masked as therapy services, had "agreed to a fallback story in the event of a Medicare audit, and "showed consciousness of his guilt" after the scheme was uncovered.)

In contrast to *Clough*, *Ruan*, and *Nerey*, the evidence presented in the instant case fell far short of showing that Dr. Chun entered into a conspiracy to violate the Anti-Kickback Act. Dr. Chun never agreed, even tacitly, to alter his prescription writing practices in response to serving as a speaker for Subsys. He never issued medically unnecessary prescriptions. He never attempted to hide records or

proceeds.  On the contrary, Dr. Chun kept meticulous records of his prescriptions.[2] He never showed any consciousness of guilt.  And perhaps most critically, Dr. Chun was never told that he needed to issue more prescriptions in order to receive more speaker events, nor was he told that his speaker events would be pared back if he didn't issue more prescriptions.  Those facts remain even in the face of clear evidence that Insys, on numerous occasions, communicated internally that it was not satisfied with Dr. Chun's prescription writing.

As Alec Burlakoff testified, he knew he couldn't influence Dr. Chun.  Dr. Chun was simply different from the other "top decile" physicians whom Insys targeted.  While Dr. Chun prescribed a high volume of TIRF medications, he did so in the best interests of his patients and only for medically necessary reasons.  He was a high volume TIRF prescriber both before and after he served as a speaker for Subsys.  The Government simply presented no evidence that Dr. Chun knowingly participated in the unlawful scheme that Insys was carrying out.  On the contrary, Dr. Chun was an unfortunate victim of that scheme.

C. <u>As to Both the Substantive and Conspiracy Counts, the Government Failed to Prove the Requisite Medicare Element</u>

---

[2] The Government even seemingly attempted to use Dr. Chun's meticulous record keeping against him when it elicited testimony from Michael Babich that Dr. Chun had boasted of his record keeping.

The evidence established that Medicare patients accounted for only a small percentage, approximately 2.7%, of Dr. Chun's patients. Of the patients Dr. Chun prescribed Subsys over the three year time period at issue, only 27 were Medicare recipients. As Dr. Chun asserted in his motion for a judgment of acquittal, the Government presented no evidence of any agreement to issue prescriptions that would be paid for by Medicare or any other federal entity. Any impact on Medicare was an afterthought, even by the Insys executives. Under the circumstances, the Government could not prove the requisite Medicare element that it charged in the superseding indictment.

In *United States v Falcone*, this Court held that the government is not required to allege and prove that the United States was the intended victim of a conspiracy to commit an offense against the United States under section 371. *United States v. Falcone*, 960 F.2d 988 (11th Cir. 1992) (en banc). Nonetheless, the substantive illegal remunerations counts still required the Government to prove that the alleged illegal remuneration was intended to induce the recipient "(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a–

7b(b)(2).  The substantive counts, indeed, charged that the illegal remunerations were paid "in return for purchasing, ordering, and arranging for, and recommending purchasing and ordering, any good, service, and item for payment which may be made in whole and in part by Medicare..." Doc. 67:26.  Therefore, while the offense clause of section 371 did not require that the United States be the target of the conspiracy, the subject of the conspiracy, which was the illegal remunerations charge, still required that the payments be designed to encourage a referral for goods or services that would be paid for by a Federal health care program.  The substantive charges clearly required that same proof.  To be sure, as the Fifth Circuit has found, the Anti-Kickback statute "criminalizes the payment of any funds or benefits designed to encourage an individual to refer another party to a Medicare provider for services to be paid for by the Medicare program." *United States v. Miles*, 360 F.3d 472, 479 (5th Cir. 2004).

In the instant case, any impact that the relevant conduct had on Medicare was merely incidental.  While some Subsys prescriptions were prescribed to Medicare recipients, the Government presented no evidence to suggest that Insys foresaw that any of the prescriptions would be covered by Medicare.  As far as Insys must have been concerned, it did not matter whether the prescriptions were paid out-of-pocket, by a private insurer, or by Medicare or any other federal health care agency.  Again, the evidence established that Medicare's role was never contemplated.  Under the

circumstances, the Government could not thereby prove the federal health care

element of the illegal remunerations statute. Consequently, the evidence, in addition

to being insufficient to prove the material elements addressed above, was similarly

insufficient to prove the federal health care program element of the substantive and

conspiracy counts.

## II. THE DISTRICT COURT INVADED THE PROVINCE OF THE JURY WHEN IT ANSWERED THE TWO JURY QUESTIONS AT ISSUE

The lower court, in its answers to both of the jury questions, went beyond

merely reinstructing the jury on a point of law or permitting the jury to rehear

evidence. In answering both of those questions, the court clearly invaded the

province of the jury.

A court should make reasonable efforts to answer a jury's questions if it is

able to do so. *United States v. Lopez*, 590 F.3d 1238, 1253 (11th Cir. 2009) *citing*

*Bollenbach v. United States*, 326 U.S. 607, 612-13, 66 S.Ct. 402, 405, 90 L.Ed. 350

(1946); *United States v. Rodriguez*, 765 F.2d 1546, 1553 (11th Cir. 1985). A court's

answer must not, however, provide the jury with information that would invade the

province of the jury. In *United States v. Gonzalez*, 501 Fed.Appx. 851 (11th Cir.

2012), for instance, this Court reviewed a situation whether a district court declined

to answer a jury question. The jury posed the question of "whether sampling a small

amount of cocaine made [the defendant] culpable for possessing a larger quantity."

*Id.* at 854. The district court rejected proposed answers from the parties and

responded to the jury by instructing them to "rely upon [their] interpretation of the facts and [their] application of the jury instructions to those facts." *Id.* This Court held that the district court responded appropriately to that question because giving the jury an answer would have invaded the province of the jury. Specifically the Court reasoned "[b]ecause answering the jury's question would have required a fact intensive analysis—which would have invaded the province of the jury—we see no abuse of discretion in the district court's refusal to provide a more precise answer to the jury's question." *Id.*

Other circuits have also addressed similar situations where answering a jury's questions would invade the province of the jury. *See United States v. Neff*, 10 F.3d 1321 (7th Cir. 1993); *United States v. Rivera-Santiago*, 107 F.3d 960 (1st Cir. 1997). The Seventh Circuit, in *United States v. Neff*, addressed a situation where the jury, while deliberating in a felon in possession of a firearm trial, asked the court: "(1) what time were the police at the house to take Mark into custody?; (2) was Mark released after questioning?; and (3) what time did officer Meldrum pick up Terry's wife and go to the house to get the stereo?" *Neff*, 10 F.3d at 1323. The district court went on give the jury the following answers: "(1) April 25th at approximately 5:00 P.M., (2) No., (3) April 25th at approximately 6:15 P.M." *Id.* When the Seventh Circuit reviewed the case, it reasoned that "[t]hese questions from the jury were not the usual run-of-the-mill jury requests asking either that they be reinstructed on a

point of law or be allowed to rehear evidence that had previously been introduced and developed at trial. Instead, these questions were really requests for evidence which had not been presented at trial, and which the jury apparently thought was necessary in reaching its determination." *Id.* at 1325. The Defendant asserted on appeal that the trial court should have declined to answer the questions or instructed the jurors that they are to make their own determinations based on the evidence presented in the trial. *Id.* In answering the questions, the defendant set out, the court presented the jury with facts outside of the record. *Id.* He further asserted that, in doing so, "the judge not only plugged a hole in the government's case, but also invaded the jury's province as fact finder." *Id.* The Seventh Circuit agreed that "[i]t does appear that the judge's answers introduced additional facts that are not found in the evidence presented at trial." *Id.* The court went on to hold that presenting the jury with facts outside of the evidence presented at trial violated the defendant's Sixth Amendment rights, specifically holding that "[t]he right to be free from this extra-record infiltration is one of the protections afforded by the Sixth Amendment's guarantee of trial by jury." *Id.* at 1326. The court additionally found that, in contrast to extraneous information that might be provided by a bailiff or another juror, jurors are likely to accord great weight to extraneous information provided by a judge. *Id.* It accordingly reasoned "[s]urely it is not a stretch of the imagination to assume that when a judge conclusively establishes certain nonexisting facts as a matter of record,

a jury would feel free to accept the judge's word on the matter without ever going back to the evidence they had before them and decide if what the judge said was correct." *Id.* The court ultimately reversed the defendant's convictions based on the district court having answered the jury questions. *Id.* at 1327.

The First Circuit, in *Rivera-Santiago*, *supra*, 107 F.3d 960, similarly reversed a defendant's convictions based on a district court's answer to a jury question. The defendant in that case was charged with controlled substances offenses stemming from allegations of narcotics being airdropped from airplanes to waiting watercrafts. *Id.* at 962-63. During deliberations, the jury asked four questions including the following: "We wish to obtain the following information from the transcription notes to clarify some doubts:…If there were any sign of flashing lights from the suspect aircraft and suspect vessel." *Id.* at 964. The district court answered that question by stating "I'm going to answer that question now-if there-if there were any sign of flashing lights from the suspect aircraft and the suspect vessel, I'm going to read you the testimony of David Cruciger. Listen carefully." *Id.* at 964-65. It then read back a portion of the respective witness' testimony. *Id.* at 965. The First Circuit found that the district court's decision to read back on a portion of the witness' direct testimony "necessarily suggested to the jury that this testimony would provide 'the' answer to the jury's question." *Id.* at 965-66. It further found "the context in which the trial judge gave his response…had the effect of placing his imprimatur on the

48

facts contained in that portion of Cruciger's testimony that was read to the jury." *Id.* at 966. Perhaps most critically, it likewise held that "[t]he trial judge's answer to the question confirmed an assumption inherent in the jury's question." The First Circuit provided that the better response to the jury's question would have been to rely on its own recollection of the evidence. *Id.* at 966 n.6. In answering the question as it had, on the other hand, the district court "invaded the province of the jury" and committed reversible error. *Id.* at 966.

As in *Neff* and *Rivera-Santiago*, the district court's answers to the jury's questions helped plug holes in the Government's case by specifically directing the jury to various Government evidence that it could use to answer its vague and unclear questions. As the Seventh Circuit reasoned in *Neff*, a judge's comments carry great weight with a jury. The district court, in directing the jury to specific evidence and suggesting that it could answer their questions, assisted the jury in making determinations of fact – determinations that squarely lied in the province of the jury.

A. The Question Concerning the Calculation of the Per Unit Costs

As the Government recognized when the jury asked its question, the Government's exhibits did not include data on the per unit cost of the various Subsys dosages. The jury, nonetheless, asked to be directed to data that it could utilize to make the per unit cost determination. The jury directly asked the court for assistance

in making a determination of fact. While such a factual determination was a clear question for the jury, the court, nonetheless, directed the jury to specific Government exhibits and suggested that it utilize that evidence in making its determination. The court's suggestion that the jury rely on the exhibits failed to account for the fact that the use of the exhibits may well have been an inaccurate or unreliable means of determining the cost per unit because, by the Government's own concession, the exhibits displayed PDE calculations. Either way, as in *Rivera-Santiago*, the court's answer to the jury's question directed the jury to specific evidence and suggested that it rely on that evidence in making its determination of facts. While the court surely had good intentions in giving its answer, its answer nonetheless invaded the province of the jury.

## B. The Question Concerning the Text Messages

The court's answer to the question posed on the second day of deliberations very likely had an even greater impact on the jury's verdicts. The jury was clearly bewildered by the Government's argument concerning the alleged forwarded texts because it never saw any such evidence during the trial. The Government indeed did not address those text messages in any way whatsoever during its case. Despite not having addressed those messages at any point during the trial, it argued in closing the test messages were "clearly forwarded from Chun" and were "incriminating

texts" from Dr. Chun that were purportedly deleted in an alleged showing of consciousness of guilt.

In making those arguments, the Government was relying on facts not in evidence. The record, moreover, was unclear as to which exhibits the Government was relying on in making those arguments because it did not state the numbers of the exhibits to which it was referring. Therefore, when the court directed the jury to the Government's exhibits, the court, as seen in *Neff*, plugged a hole in the Government's case and gave credence to the Government's argument of facts not in evidence. The jury, in turn, likely relied on the Government's argument to make a misplaced finding of knowledge and willfulness on the part of Dr. Chun.

Under the circumstances, the district court's answer to the jury question was tantamount to the submission of extraneous information because it validated the Government's claim that the text messages were forwarded from Dr. Chun. Therefore, as in *Neff*, the court's answer, while again likely well-intentioned, violated Dr. Chun's Sixth Amendment rights. The court's answer to the jury appeared to be compelling because the jury, after having deliberated for two days, rendered its verdicts shortly after receiving the answer. Dr. Chun thereby suffered clear prejudice as a result of the error.

## III.

### THE DISTRICT COURT ERRED IN HOLDING DR. CHUN ACCOUNTABLE FOR THE ENTIRE AMOUNTS PAID BY MEDICARE, AS OPPOSED TO THE NET VALUE OF THE IMPROPER BENEFIT TO BE CONFERRED BY THE ALLEGED ILLEGAL REMUNERATIONS

The district court further erred in determining the net value of the improper benefit to be conferred by the alleged remunerations. Rather than attempting to determine the net benefit, the court simply relied on the total amount that Medicare paid for all Subsys prescriptions issued during the time period covered in the indictment. In doing so, the court failed to comply with the directives of Section 2B4.1 and applicable holdings of this Court.

### A. Section 2B4.1 Requires a Calculation of the *Net* Value of the Benefit to be Conferred

Section 2B4.1 provides for a base offense level of 8 and then cross-references the loss table of Section 2B1.1 for an increase in the offense level accordingly "[i]f the greater of the value of the bribe or the improper benefit to be conferred" exceeded $6,500. U.S.S.G. § 2B4.1(a), (b). This Court has reasoned that "[a]ssuming the bribe achieves its intended result, the benefit would usually exceed the bribe." *United States v. v. DeVegter*, 439 F.3d 1299, 1303 (11th Cir. 2006). The value of the actual bribe should, therefore, only be used if the district court cannot estimate the net value of the improper benefit to be received. *Id.* at 1303-04. District courts are, of course, permitted to make reasonable estimates of the applicable net value of the improper

benefit. *Id.*; *see also United States v. Medina*, 485 F.3d 1291, 1304 (11th Cir. 2007). "But '[w]hile estimates are permissible, courts must not speculate concerning the existence of a fact which would permit a more severe sentence under the guidelines.'" *Medina*, 485 F.3d at 1304 *quoting United States v. Sepulveda*, 115 F.3d 882, 890 (11th Cir. 1997). In addition, "[t]he government bears the burden of establishing the estimated net value with reliable and specific evidence." *DeVegter*, 439 F.3d at 1304 *citing United States v. Cabrera*, 172 F.3d 1287, 1292 (11th Cir. 1999).

In *United States v. DeVegter*, *supra*, 439 F.3d 1299, this Court held that the determination of the applicable loss amount under 2B4.1 should include a deduction of the "direct costs, but not indirect costs, from profits to determine the net improper benefit." In so holding, the Court adopted an approached advanced by the Firth Circuit in *United States v. Landers*, 68 F.3d 882 (5th Cir. 1995). This Count stated that "[i]n *Landers,* the Fifth Circuit defined direct costs as 'all variable costs that can be specifically identified as costs of performing a contract.'" *Id.* at *quoting Landers*, 68 F.3d at 884 n. 2. The Court went on to provide "[u]nlike the accounting term 'direct costs' for sentencing purposes, variable overhead costs not easily identifiable to a specific contract are not direct costs. *Id.* The court can ignore these variable costs in sentencing because the sentencing courts are not required to make precise calculations." *Id.* As *DeVegter* clearly established, the determination of the net

value of the improper benefit to be conferred under Section 2B4.1 is very different from the loss amount determination under Section 2B1.1. *See United States v. Hill*, 745 Fed.Appx. 806 (11th Cir. 2018) (finding plain error at sentencing in a healthcare kickback case where the district court relied on the total amount billed for prescriptions without attempting to determine the net value of the benefit to be conferred).

### B. The Court Erred in Determining the Offense Level Applicable Under U.S.S.G. § 2B4.1

In contrast to employing the method set forth in *DeVegter*, the district court accepted a blanket proposed loss amount that represented the entire amount that Medicare paid Insys for Subsys prescriptions. Pursuant to Section 2B4.1 and *DeVegter*, however, the process for determining the applicable loss amount in an illegal remunerations case was much more involved than the process the district court employed to reach that simple figure. To determine the *net* value of the benefit conferred, the court was required to deduct any of the direct costs incurred in the preparation and supply of the Subsys prescriptions and calculate the *net* gain that resulted from the kickback. Insys' net improper benefit should have included only the net gain that Insys cleared for the prescriptions that Medicare paid. At the very least, that net benefit should not have included the costs of the payments made to Dr. Chun, the costs of the speaker events, and the costs of manufacturing the Subsys medications. The Government did not, however, submit any competent evidence to

establish the deductible direct costs and to determine the net improper benefit conferred. As a result, the "loss amount" was simply based on the gross value of the improper benefit to be conferred in direct contrast to the method laid out by this Court in *DeVegter*.

Because the Government did not present any evidence of the deductible direct costs incurred for each prescription used in the calculation of the value of the benefit to be conferred, it is virtually impossible to determine the net value of the benefit conferred based on the record before this Court. Given the expected profit margin, it is very likely that the net benefit conferred would have been far less than the $3.5 million threshold. As a result, had the net benefit been properly calculated under Section 2B1.4, the corresponding offense level from the 2B1.1 loss amount table would have decreased by at least two levels, if not more. *See* U.S.S.G. § 2B1.1(b)(1). Depending on the amount of the deductible direct costs, the correct Guidelines range might have been far lower than the district court's calculation. To be sure, under the circumstances, determining the net improper benefit conferred may have been impractical. In such an instance, the plain text of section 2B4.1 would have required the court to rely on the value of the alleged bribes. The value of the alleged bribes, in turn, would have been less than $250,000, resulting in an eight-level swing in the Guidelines offense level calculation.

As set forth above, the district court's adoption of a loss amount based on the full amount paid by Medicare, without any consideration of deductible direct costs, clearly violated the plain text of Section 2B4.1 and the holding of *United States v. DeVegter*. That error, in turn, almost surely impacted the Guidelines offense level determination. The court's error in miscalculating the net benefit conferred cannot, therefore, be harmless.

## **CONCLUSION**

Based on the foregoing, Appellant Chun respectfully requests that this Honorable Court reverse the judgment and sentences and remand this case with instructions to enter a judgment of acquittal or, in the alternative, to conduct a new trial.

Respectfully Submitted,

s/ *J. Jervis Wise*
J. JERVIS WISE, ESQ.
BRUNVAND WISE, P.A.
615 Turner Street
Clearwater, FL 33756
Telephone:  727-446-7505
Facsimile:  727-446-8147
E-Mail: jervis@acquitter.com
Florida Bar # 0019181
Counsel for Appellant Chun

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

The undersigned certifies, pursuant to 11th Circuit Rule 28-1, that this Brief complies with the type-volume limitation of Federal Rule of Appellate Procedure because it contains 12,991 words, excluding the parts exempted by subsection 32(a)(7)(B)(iii).  Microsoft Word software was used to count the words in the foregoing Brief.  This Brief, likewise, complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point, Times New Roman font.

s/ *J. Jervis Wise*
J. JERVIS WISE, ESQ.
BRUNVAND WISE, P.A.
615 Turner Street
Clearwater, FL 33756
Telephone:  727-446-7505
Facsimile:  727-446-8147
E-Mail: jervis@acquitter.com
Florida Bar # 0019181
Counsel for Appellant Chun

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed

using the CM/ECF system, which will send a notice of electronic filing to all counsel

of record, on June 2, 2023.

s/ *J. Jervis Wise*

J. JERVIS WISE, ESQ.
BRUNVAND WISE, P.A.
615 Turner Street
Clearwater, FL 33756
Telephone:  727-446-7505
Facsimile:  727-446-8147
E-Mail: jervis@acquitter.com
Florida Bar # 0019181
Counsel for Appellant Chun

I FURTHER CERTIFY that seven hard copies of the foregoing brief are being

furnished to the Clerk of this Court by mail.

s/ *J. Jervis Wise*

J. JERVIS WISE, ESQ.
BRUNVAND WISE, P.A.
615 Turner Street
Clearwater, FL 33756
Telephone:  727-446-7505
Facsimile:  727-446-8147
E-Mail: jervis@acquitter.com
Florida Bar # 0019181
Counsel for Appellant Chun
