No. 22-14192-D

# In the United States Court of Appeals for the Eleventh Circuit

———————

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

STEVEN CHUN and DANIEL TONDRE,
Defendants-Appellants.

———————

On Appeal from the United States District Court
for the Middle District of Florida
No. 8:20-cr-120

———————

**BRIEF FOR THE UNITED STATES**

———————

ROGER B. HANDBERG
United States Attorney

DAVID P. RHODES
Chief, Appellate Division
Middle District of Florida

NICOLE M. ARGENTIERI
Acting Assistant Attorney General

LISA H. MILLER
Deputy Assistant Attorney General

DAVID M. LIEBERMAN
Attorney
Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530
(202) 262-6805
david.lieberman@usdoj.gov

## CERTIFICATE OF INTERESTED PERSONS

*United States of America v. Steven Chun & Daniel Tondre*
No. 22-14192-D

Undersigned counsel for the United States of America hereby certifies that the following is a complete list of persons and entities who have an interest in the outcome of this case.  Persons not included in the Certificate of Interested Persons set forth in Appellants' briefs are listed in bold.

Albrecht, Carol

**Argentieri, Nicole M., Acting Assistant Attorney General, Dep't of Justice**

Brunvand, Bjorn E., trial counsel for Tondre

Campbell, Tamera

Chang, John

Chun, Steven

Diaz-Rivera, Myrdalis

Flynn, Sean P., United States Magistrate Judge

Futerman, Roger, trial counsel for Tondre

Gershow, Holly, Assistant United States Attorney

Handberg, Roger B., United States Attorney

Hoppmann, Karin, former Acting United States Attorney

Howard-Allen, Kelley Clement, Assistant United States Attorney

Jung, William F., United States District Court Judge

**Lieberman, David, Trial Attorney, Dep't of Justice**

Lopez, Maria Chapa, former United States Attorney

Medicare

**Miller, Lisa H., Deputy Assistant Attorney General, Dep't of Justice**

Nebesky, Suzanne C., Assistant United States Attorney

Peresie, Jennifer Lynn, Assistant United States Attorney

Rankin, Mark P., trial counsel for Chun

Reder, Jessica N., Assistant United States Attorney

Rhodes, David, Assistant United States Attorney

Simonsen, Julie A., Assistant United States Attorney

Smith, Gregory (deceased)

Sneed, Julie S., United States Magistrate Judge

Tondre, Daniel

Tuite, Christopher P., United States Magistrate Judge

Waid, Nicole Hughes, trial counsel for Chun

Wise, J. Jervis, appellate counsel for Chun

Zimmerman, Warren A., appellate counsel for Tondre

No publicly traded company or corporation has an interest in the outcome of this appeal to the undersigned's knowledge.

/s/ David M. Lieberman

## STATEMENT REGARDING ORAL ARGUMENT

These criminal appeals advance straightforward sufficiency and sentencing claims. The government believes the facts and legal contentions are adequately discussed in the briefs and that oral argument would not significantly aid the Court's decisional process.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS.........................................C-1

STATEMENT REGARDING ORAL ARGUMENT ...................................i

TABLE OF AUTHORITIES ........................................................... v

JURISDICTIONAL STATEMENT ............................................... 1

ISSUES PRESENTED ................................................... 1

STATEMENT OF THE CASE ...................................................... 2

I.    Procedural History ................................................... 2

II.   Statement of Facts.................................................... 2

      A.    Insys obtained FDA approval to distribute Subsys but then executed a disappointing sales launch of the drug ....................... 4

      B.    Insys revamped its marketing and sales strategies to provide kickback payments to doctors who prescribed Subsys ................. 6

            1.  Insys used speaker programs to pay doctors who prescribed large amounts of Subsys ......................................... 6

            2.  Insys further encouraged the doctors to increase their Subsys prescription dosages ............................................... 8

            3.  Insys deceived insurance companies into approving Subsys prescriptions issued by the doctors ......................... 9

      C.    Chun participated in speaker programs facilitated by Tondre, collected payments, and prescribed increasing amounts of Subsys ................................................... 10

            1.  Chun joined the Insys speaker program and agreed to prescribe Subsys.................................................... 11

2. Insys hired Tondre to plan Chun's speaker programs and increase his Subsys prescriptions ............................................ 12

3. Insys also hired Chun's girlfriend to further encourage his Subsys prescriptions ............................................................ 14

4. Chun's prescriptions and speaker fees significantly increased over time ................................................................................ 16

II. Course of Proceedings ......................................................... 18

III. Rulings Presented and Standards of Review ........................................ 19

SUMMARY OF ARGUMENT ..................................................... 20

ARGUMENT ..................................................................... 24

I. Ample evidence supports Chun's convictions ...................................... 24

A. Chun joined a conspiracy in which he knowingly and willfully accepted kickbacks for his Subsys prescriptions ........................... 24

1. Conspiracy ...................................................... 25

2. Substantive Anti-Kickback Violations .................................. 29

B. The jury reasonably found that this kickback scheme involved prescriptions that could trigger Medicare payments ................... 34

II. Ample evidence supports Tondre's convictions ................................... 37

A. The Anti-Kickback Statute's safe-harbor provision provides no relief for Tondre ....................................................... 37

1. Tondre waived this affirmative defense by failing to raise it at trial ...................................................... 37

2. In any event, the safe-harbor provision does not apply to Tondre's conduct ................................................. 38

B.    Tondre's other sufficiency arguments lack merit ........................ 40

III.    The district court appropriately exercised its discretion in responding to jury notes ................................................................................................ 45

A.    Jury note regarding the per-unit cost of Subsys .......................... 45

1. Background .......................................................................... 45

2.  Discussion ........................................................................... 47

B.    Jury note regarding text messages .............................................. 51

1. Background .......................................................................... 51

2.  Discussion ........................................................................... 53

C.    Any error was harmless ............................................................. 56

IV.    No reversible error occurred at sentencing .......................................... 57

A.    Background ................................................................................ 58

B.    The district court did not plainly err in calculating the net value of the benefits conferred .................................................................. 61

C.    In any event, the district court stated that it would have imposed the same sentence using its 18 U.S.C. § 3553(a) discretion ......... 64

CONCLUSION ......................................................................................... 65

CERTIFICATE OF COMPLIANCE ......................................................... 66

# TABLE OF AUTHORITIES

## Cases

*Carrel v. AIDS Healthcare Foundation*, 898 F.3d 1267 (11th Cir. 2018) ............ 40

*Puckett v. United States*, 556 U.S. 129 (2009) ................................. 20

*United States v. Azmat,* 805 F.3d 1018 (11th Cir. 2009) ................................. 19

*United States v. Bokine*, 523 F.2d 767 (5th Cir. 1975) ..................................... 56

*\*United States v. Clough*, 978 F.3d 810 (1st Cir. 2020) ..............................passim

*United States v. Coats*, 8 F.4th 1228 (11th Cir. 2021) ...................................... 38

*United States v. Corbett*, 921 F.3d 1032 (11th Cir. 2019) ................................. 61

*\*United States v. DeVegter*, 439 F.3d 1299 (11th Cir. 2006) .................. 20, 61, 62

*United States v. Downs*, 61 F.4th 1306 (11th Cir. 2023) .................................. 44

*United States v. Gallup,* 812 F.2d 1271 (10th Cir. 1987) .................................. 38

*United States v. Gibson*, 875 F.3d 179 (5th Cir. 2017) ..................................... 29

*United States v. Goldman*, 953 F.3d 1213 (11th Cir. 2020) .............................. 64

*United States v. Gonzalez*, 834 F.3d 1206 (11th Cir. 2016) .............................. 54

*United States v. Gonzalez*, 566 Fed. Appx. 898 (11th Cir. 2014) ..................... 63

*\*United States v. Keene*, 470 F.3d 1347 (11th Cir. 2006) ................................. 64

*United States v. Kington*, 875 F.2d 1091 (5th Cir. 1989) .................................. 32

*United States v. Lopez*, 590 F.3d 1238 (11th Cir. 2009) ................................... 19

*United States v. Maradiaga*, 987 F.3d 1315 (11th Cir. 2021) ............................ 54

*United States v. Najjar*, 283 F.3d 1306 (11th Cir. 2002) ................................... 38

*United States v. Neff*, 10 F.3d 1321 (7th Cir. 1993) .......................................... 56

*United States v. Nerey*, 877 F.3d 956 (11th Cir. 2017) ................................26, 33

*United States v. Njoku*, 737 F.3d 55 (5th Cir. 2013) ........................................ 25

*United States v. Norton*, 17 Fed. Appx. 98 (4th Cir. 2001) ............................. 38

*United States v. Olano*, 507 U.S. 725 (1993) ................................................... 63

*United States v. Paisley*, 178 Fed. Appx. 955 (11th Cir. 2006) ........................ 42

*United States v. Patel*, 778 F.3d 607 (7th Cir. 2015) ........................................ 29

*United States v. Rivera-Santiago*, 107 F.3d 960 (1st Cir. 1997) ................passim

*United States v. Rodriguez,* 765 F.2d 1546 (11th Cir. 1985) ............................ 45

*United States v. Ruan*, 966 F.3d 1101 (11th Cir. 2020) ................................... 33

*United States v. Scott*, 61 F.4th 855 (11th Cir. 2023) ....................................... 27

*United States v. Shah*, 84 F.4th 190 (5th Cir. 2023) ...................................34, 36

*United States v. Sosa*, 777 F.3d 1279 (11th Cir. 2015) .................................... 25

*United States v. Starks*, 157 F.3d 833 (11th Cir. 1998) ................................... 39

*United States v. Turner*, 561 Fed Appx. 312 (5th Cir. 2014) ........................... 37

*United States v. Verdeza*, 69 F.4th 780 (11th Cir. 2023) ................................. 20

*United States v. Vernon*, 723 F.3d 1234 (11th Cir. 2013) ...................... 37, 38, 39

## Statutes, Rules, and Other Authorities

18 U.S.C. § 2 ................................................................................................. 2

18 U.S.C. § 371 ...................................................................................... 2

18 U.S.C. § 1028 .................................................................................... 2

42 U.S.C. § 1320a-7b ......................................................................passim

18 U.S.C. § 3231 ...................................................................................... 1

18 U.S.C. § 3553 ................................................................... 60, 64, 65

18 U.S.C. § 3742 ...................................................................................... 1

28 U.S.C. § 1291 ...................................................................................... 1

U.S.S.G. § 2B1.1 ................................................................................ 58

U.S.S.G. § 2B4.1 ...........................................................................passim

U.S.S.G. § 2C1.1 .........................................................................61, 63

## JURISDICTIONAL STATEMENT

Steven Chun and Daniel Tondre appeal the final judgments in this criminal case.  The district court, which had jurisdiction under 18 U.S.C. § 3231, entered the judgments on December 5 and 15, 2022.  DE.299, DE.309.[1]  Chun and Tondre filed timely notices of appeal.  DE.311, 317.  This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## ISSUES PRESENTED

1.    Whether sufficient proof supports the jury's verdicts that Chun conspired to pay and receive healthcare kickbacks, and received kickbacks, in connection with a federal healthcare program.

2.    Whether sufficient proof supports the jury's verdicts that Tondre conspired to pay and receive healthcare kickbacks; offered and paid kickbacks in connection with a federal healthcare program; and committed identification fraud in connection with the kickback payments.

3.    Whether the district court appropriately exercised its discretion in responding to jury notes.

---

[1] DE refers to the district court docket entry; GEX refers to a government trial exhibit.

4.    Whether the district court committed reversible error under Sentencing Guidelines § 2B4.1(b)(1) when it found that the offense conduct conferred $4.5 million in improper benefits.

## STATEMENT OF THE CASE

### I.    Procedural History.

After a 10-day trial, a jury convicted Chun of conspiracy to defraud the United States and to pay and receive healthcare kickbacks, in violation of 18 U.S.C. § 371; and five counts of receiving kickbacks in connection with a federal healthcare program, in violation of 42 U.S.C. § 1320a-7b(b)(1) and 18 U.S.C. § 2. DE.299:1. The jury also convicted Tondre of conspiracy to defraud the United States and to pay and receive healthcare kickbacks, in violation of 18 U.S.C. § 371; five counts of offering and paying kickbacks in connection with a federal healthcare program, in violation of 42 U.S.C. § 1320a-7b(b)(2) and 18 U.S.C. § 2; and two counts of identification fraud, in violation of 18 U.S.C. § 1028(a)(7) and 2. DE.309:1. The district court sentenced Chun and Tondre to 42 and 48 months of imprisonment, respectively. DE.299:3; DE.309:3.

### II.    Statement of Facts.

In 2012, Insys Therapeutics launched Subsys—a rapid-onset fentanyl spray administered beneath the tongue. The Food and Drug Administration (FDA) had approved Subsys to treat breakthrough cancer pain—short-lived

spikes in pain experienced by cancer patients already suffering constant pain. Subsys, which is a Schedule II controlled substance, carried a high risk of abuse and addiction.

The launch failed to generate the projected prescription numbers or revenue. Months later, Insys overhauled its sales and marketing strategies. Of note, Insys invited certain doctors to present at "speaker programs" with the stated goal of educating other doctors about Subsys. For the most part, however, these events were poorly attended and contained no educational component. Insys executives instead intended and used the programs as a conduit to pay kickback money to the speakers. As those doctors prescribed more Subsys, they received more speaker invitations and collected more kickbacks.

At an August 2012 meeting with an Insys executive, Dr. Steven Chun agreed to prescribe Subsys in exchange for speaker programs and payments. He then appeared at numerous speaker programs, many of which were shams, and received over $278,000 from Insys. During the same period, Chun prescribed ever increasing amounts of Subsys to his patients. Daniel Tondre, an Insys sales representative, facilitated Chun's speaker programs and pushed him to prescribe more Subsys. Based on this conduct, the jury found Chun and Tondre guilty.

3

### A.    Insys obtained FDA approval to distribute Subsys but then executed a disappointing sales launch of the drug.

In early 2012, FDA approved Subsys—a sublingual fentanyl spray manufactured by Insys "[f]or the management of breakthrough pain in adult cancer patients who are already receiving and who are tolerant to around-the-clock opioid therapy." DE.234:106-107.

Because Subsys "pose[d] a serious and significant public health concern," the FDA distributed a medication guide outlining its proper dosage and administration. DE.234:109. The guide stated that the initial Subsys dose was 100 micrograms and that doctors could titrate an individual patient up to a higher dose to provide adequate relief. DE.234:110. Moreover, given "the risks of misuse, abuse, addiction, overdose and serious complications," a doctor could prescribe Subsys to a patient only after following certain risk evaluation and mitigation strategy ("REMS") procedures. DE.234:107-108. The doctor, pharmacy, and patient all had to enroll in the REMS program. DE.234:281.

Subsys was expensive, with an average $2,000-$3,000 monthly cost in 2012. DE.234:115. That cost later increased and some prescriptions exceeded $20,000 per month. *Ibid*. Doses were administrated in strengths between 100 and 1,600 micrograms. DE.234:111.

After the FDA's approval, Insys hired sales representatives to market Subsys to doctors. DE.234:125. The company placed "poor[,] hungry and

driven individuals" into these positions, offering them a low salary and unlimited bonus potential. DE.234:124-125. Its philosophy: "we'll just keep paying you" "the more you keep selling" Subsys. DE.234:126. Insys also provided representatives with a list of "high-decile doctors" who "prescribe[d] a lot of rapid-onset opioids" in their area. DE.232:48. "Everyone in the executive department of Insys, from [the representative's] manager all the way up to the CEO and owner," focused on those doctors. *Ibid.*

Dr. Chun was one of these doctors. Insys executives viewed him as a "whale"—meaning a doctor "prescrib[ing] a lot of rapid-onset opioids" whom the sales representatives "needed to go after."[2] DE.232:48; *see also* DE.234:117 (testimony that Chun's fentanyl prescriptions could potentially generate $6 million annually for Insys). They also named Chun a "thought leader" because he had been a "top writer[]" for a competitor drug. DE.234:116-117. This was "a code word for guys who could make us a lot of money if they write our drug." DE.234:117. Insys lastly paid Chun "to help … design the strategy behind the launch and the characteristics" of Subsys. DE.234:151.

---

[2] Chun enrolled in the REMS program and certified his knowledge of rapid-onset opioid drugs like Subsys—including their indications, risks, and dosing procedures. DE:234:277-280. Chun also prescribed these drugs to Medicare patients. DE.235:139-140. Chun—a Medicare-enrolled provider—knew he was subject to the federal Anti-Kickback Statute. DE.239:166-168.

Notwithstanding these efforts, the initial Subsys launch was "terrible." DE.234:113.  The company did "not bring[] in as much revenue of the drug as … we thought we could."  DE.234:133.

### B. Insys revamped its marketing and sales strategies to provide kickback payments to doctors who prescribed Subsys.

After the disappointing launch, Insys focused on "maximizing Subsys prescriptions with [its] high decile customers."  DE.236:9.

#### 1. Insys used speaker programs to pay doctors who prescribed large amounts of Subsys.

This effort revolved around "speaker programs"—events where a physician discussed his or her experiences using a particular medication and ostensibly educated the other practitioners in attendance.  DE.234:133-135.  But Insys executives viewed the programs as bribery opportunities: "put money in certain physicians' hands," DE.234:134, and "pay [them] to write more scripts for Subsys," DE.232:54.  They identified 18-20 doctors across the country for the Insys speaker budget.  DE.236:6.  Sales representatives "were encouraged to get as many speaker programs on the books or scheduled and make [their] top decile doctors … speakers."  DE.232:53.  The company wanted to "own and solidify [its] Subsys loyalists to ensure the company's longterm existence."  DE.236:13.  These targets included Chun.  DE.236:14.

In a September 2012 email, Vice President of Sales Alec Burlakoff emailed the sales force—copying other executives—stating that speaker "programs have been offered to you as the number one opportunity to grow your business." DE.236:18-19. "The hungry/motivated sales representatives will be facilitating as many … speaker programs as humanly possible." DE.236:19.

Many speaker programs "were not … done properly or were complete shams." DE.234:194-195. But Insys executives did not care. DE.234:191-192; DE.236:70. In a conversation with one sales representative, Burlakoff explained that "it was more important to just have the speaker program for the doctor" and "it didn't really matter who was in attendance." DE.234:10. "It could be [the doctor's] nurse," "his nurse practitioner," "his wife, his girlfriend, whatever." *Ibid*. Sales representatives also forged signatures of attendees or obtained signatures from individuals who did not attend the program, thereby giving the "optics" of a legitimate educational program. DE.236:72.

Doctors who served as Subsys speakers received up to $3,000 from Insys for each program. DE.234:144-145. And top doctors like Chun collected over $100,000 annually. DE.234:198; p.16, *infra*. Insys tracked its return on investment, looking at "how much money [it] spen[t] on a physician and what [it] got back in terms of scripts." DE.234:152. "[I]f a doctor provided a 2-to-1 return on investment or higher, they were kept on the program." DE.234:152-

7

153.  Doctors who fell below that threshold were "deleted" from the speaker program.  DE.234:153.  Executives monitored these prescribing patterns at a daily 8:30 a.m. meeting.  DE.234:130-131.

### 2. Insys further encouraged the doctors to increase their Subsys prescription dosages.

The FDA guide specified that Subsys should be prescribed at an initial 100-microgram dose.  DE.234:110.  Insys nevertheless crafted "effective dose messaging" asserting that "patients aren't doing well on the 100 and 200 [microgram doses]" in the hope of encouraging doctors to "start[] at higher doses."  DE.234:113.  Burlakoff told sales representatives to "educate our physicians on how to ensure their patients find the effective dose" and that "we are truly better off dissuading a physician to prescribe Subsys for 100 and 200 micrograms."  DE.236:24.  Representatives also received a notification "each and every time a prescriber in [their] territory wr[ote] for a Subsys prescription at 100 micrograms or 200."  DE.236:23.  The representative had to report back to headquarters within 24 hours as to why the doctor had prescribed that dose and how he or she planned to titrate the patient up to a higher dose.  *Ibid*.

A doctor who prescribed Subsys at higher doses generated more revenue for Insys.  DE.234:115; DE.236:8.  The sales representative assigned to the doctor, in turn, received a higher bonus.  DE.234:115.

8

### 3.    Insys deceived insurance companies into approving Subsys prescriptions issued by the doctors.

Subsys was expensive.  DE.234:115.  Insurance companies covered the drug only if the doctor obtained prior authorization, DE.234:123-124; the patient had a breakthrough-cancer-pain diagnosis, DE.237:135; and the patient had tried other medications and failed to obtain relief, DE.237:134.  But "the majority of the [Subsys] scripts … were written … outside of the indication"—*i.e.*, for patients who did not have cancer and were suffering from ailments like headaches, migraines, back pain, and slipped discs.  DE.234:92.  As a result, insurance companies approved coverage for only 35-40% of prescriptions.  DE.234:123.  And when prescriptions "don't actually get covered by insurance, the company doesn't earn any money."  DE.236:44.

To fix this problem, Insys opened the Insys Reimbursement Center (IRC) in October 2012.  DE.234:123-124.  The IRC increased approval rates to 75-85%, DE.237:113, with the following tools.

First, Insys had its sales representatives communicate with the doctor's office, collect patient information, and transmit it to the IRC.  DE.234:124.  For instance, Tondre "c[ould] get [the IRC] any information that is needed" for a Chun prescription.  DE.237:145.  A nurse practitioner recalled Tondre looking at patient files even though he did not work at Chun's office.  DE.236:241-242.

9

Once the IRC had the necessary information, it contacted the insurance company on the doctor's behalf to request Subsys authorization. DE.237:120

Second, Insys hired area business liaisons to assist high-performing sales representatives in collecting patient and prescription information.[3] DE.236:67-68. *See* DE.237:145 (email that Aqsa Nawaz, a liaison assigned to Chun's territory, could obtain patient information).

Third, the IRC collected information on each insurer's coverage decisions and identified diagnoses and conditions that prompted decisions to approve Subsys prescriptions. DE.237:168-169. In then developed deceptive strategies to evade those prescription coverage requirements and mislead insurers into paying for Subsys prescriptions. DE.237:172-174. For instance, when seeking approval, the IRC "misl[ed] insurers into thinking the patient had cancer." DE.237:174.

### C. Chun participated in speaker programs facilitated by Tondre, collected payments, and prescribed increasing amounts of Subsys.

Chun participated in the Insys speaker program between 2012 and 2015 and collected over $278,000. DE:239:188. Over that period, his Subsys prescriptions increased significantly.

---

[3] This position was also called a business relationship manager. DE.237:194.

### 1.  Chun joined the Insys speaker program and agreed to prescribe Subsys.

In June 2012, and after learning of Chun's "slowed" Subsys writing, Insys CEO Michael Babich decided to send "a corporate higher-up" to offer Chun a speaker-program invitation.  DE.234:138.  Burlakoff and Tracy Krane (a sales representative) visited Chun at his office.  DE.232:54-56; DE.235:261.  Chun subsequently signed an Insys speaker agreement, which paid him $2,400 for each program.  DE.234:139-143.  His compensation increased to $3,000 per program in subsequent years.  DE.234:144-145.

A second meeting with Chun occurred in August 2012.  DE.232:58.  Over dinner, Burlakoff said he "ha[d] a large budget" of $100,000 and "planned on using every [p]enn[y] of it so long as [Chun] was prescribing Subsys in return." DE.235:262.  Burlakoff conveyed a "pretty simple" message: "we're going to pay you, you're going to prescribe Subsys."  DE.235:263.  Chun "[v]erbally … agreed" to the arrangement.  *Ibid*.

Krane monitored Chun's prescriptions and reported that Chun "[i]s writing" Subsys, but she "[i]ndicated that he needs to push harder for Subsys" and that she had scheduled his first speaker program.  DE.232:72.  Two weeks later, after that first program, Chun informed his nurse practitioner that "they really needed to get their patients off Fentora," a competitor drug, "and switched

11

over to Subsys." DE.232:77. Chun also advised Krane that he had encountered coverage problems but was "going to try harder for Subsys." *Ibid*.

The next month, Krane reported: "[Chun] is increasing the number of patients on Subsys and is really trying to work through coverage issues …. I believe the speaker programs are motivating him more." DE.232:79. Chun also said: "he will work for [Krane] because [she is] working hard for him." DE.232:80.

But Chun's initial prescribing did not meet internal expectations. Insys paid Chun $12,000 and generated $21,155 in revenue, reflecting a 1.8 return-on-investment multiple. DE.234:158. The company was "only scratching the surface of his potential Subsys writing." DE.234:161. Krane was fired because Chun had not issued enough insurance-paid prescriptions. DE.234:29, 31.

### 2. Insys hired Tondre to plan Chun's speaker programs and increase his Subsys prescriptions.

Tondre joined Insys in December 2012. DE.234:160. Tondre had been a top sales representative with a competitor pharmaceutical company (Cephalon). DE.234:161-162. Insys executives recruited Tondre because he "already had a relationship with Dr. Chun" and had experience "pa[ying doctors] as speakers." DE.234:162-163. Burlakoff predicted that Tondre "would take Dr. Chun and turn him around." DE.236:38.

12

Insys offered Tondre a $80,000 salary—double that of other sales representatives—because he "had the past relationship" with Chun. DE.234:164-165.  In his position, Tondre arranged Chun's speaker programs. *See* DE.238:40-41 (Tondre-Chun scheduling messages).  And because Chun "was the most significant prescriber in the territory," it was priority to give him "a ton of speaker events [that] made him happy."  DE.237:285-286; *see* DE.236:109 (Burlakoff: Tondre authorized to schedule $100,000 worth of programs for Chun).

Tondre scheduled programs at fancy restaurants that he or Chun preferred.  DE.237:286.  The programs often lacked an educational component. DE.235:33-34,71; DE.236:246-247, 254; DE:237:9, 283; DE.238:207-208.  At one, Chun's presentation consisted of a single sentence: "hey, use Subsys, it's good."  DE.237:31.  Although the speaker programs were ostensibly aimed at educating prescribers, individuals who lacked prescribing authority—including Chun's family—attended.  DE.237:292, 301.  Sign-in sheets falsely listed signatures of doctors and pharmacists who were not present.  DE.235:12-20, 73-77, 208-225; DE.236:248-249, 257-261, DE:237:9-13, 34-36, 40-42; DE.238.8-13, 209-225.  Tondre and his area business liaison (Andre Rosado) forged signatures of those doctors and pharmacists—whom they characterized as "[s]traw clinicians."  DE.237:290-291.

13

At the same time, Tondre encouraged Chun to increase his Subsys prescriptions, saying: "[t]he more prescriptions, the better" and "[h]elp him get more Subsys." DE.237:281. The morning after one speaker program, Tondre texted: "Hope all is well and you got great rest. Hopefully soon we can go on a double date. Think Subsys." DE.238:27. Chun responded: "I already wrote, not kidding, over 500 units of 1600 micrograms." *Ibid.* Other messages show that Tondre received updates from Chun about his Subsys prescriptions. *See* GEX:213B (Chun "[l]ooking for sub pts"); GEX:213D ("8 rx today already"); GEX:213E (Chun "knows numbers are low he is working it").

In all, Tondre was a "very successful sales rep." DE.234:165. During his tenure, Chun became a top Subsys prescriber and his average weekly prescriptions "[went] up over time." DE.234:170-171, 173. Insys's "return on investment [was] there." DE.236:88. Given this success, Tondre joined the President's Club—a distinction awarded to the top 2% of Insys sales representatives. DE.236:102-103.

### 3. Insys also hired Chun's girlfriend to further encourage his Subsys prescriptions.

Aqsa Nawaz—a pharmacy technician and Chun's girlfriend—contacted an Insys executive about a job. DE.239:15-16. Chun also told two other executives that "[he] wanted her hired." DE.236:77. Burlakoff received

14

Nawaz's resume, DE.237:143-144, expedited her hiring as an area business liaison, DE.236:78-79, and exempted her from training "[b]ecause she's Dr. Chun's girlfriend," DE.236:80; *see* DE.234:184 (Babich: Nawaz was hired "in the hopes that … [Chun] would continue to write Subsys prescriptions and hopefully write more.").

Nawaz started in September 2013. DE.239:17-18. Her job was "[t]o help [Tondre] and to try to increase sales." DE.239:18. At the time, Subsys had grown to 40% of Chun's prescriptions, but that was "[n]ot even close to meeting anyone's expectations." DE.236:85. Burlakoff wanted a 90% market share—an expectation communicated to Tondre and Nawaz. DE.236:86, 88. Nawaz responded: "I'll speak to [Chun] tonight. I'll make sure things change." DE.236:89.

Nawaz then proposed a "game plan" to "meet the[se] expectations" or "surpass them." DE.236:92. She reported that Chun's new patients "love Subsys," but his older patients had been on competitor drugs for years; "it's a psychological thing and we have to break the cycle." *Ibid*. Nawaz affirmed that "[Chun] is dedicated to making that happen and will do it …. He wants to help." *Ibid*. She noted that Chun had "helped Actiq, Fentora"—two competitor drugs—"and now it's time for Subsys to take to the spotlight." *Ibid*.

15

By November 2013, Chun had converted all but one of his high-dose Actiq patients to Subsys and he averaged 9.8 Subsys prescriptions per week. DE.236:96, 98-99. This was "very profitable" for Insys. DE.234:196. By comparison, Chun had averaged only 1.6 weekly prescriptions in 2012. DE.234:176.

### 4. Chun's prescriptions and speaker fees significantly increased over time.

Over three years, Chun's Subsys prescriptions to Medicare patients and speaker compensation increased significantly. The following exhibit (GEX:723) displays Chun's quarterly speaker payments (the green-line plot) alongside his quarterly Subsys prescription numbers (the blue-line plot):



Internal Insys tracking reports confirmed that Chun's prescriptions increased for all patients during this period; his weekly average climbed from 1.6 Subsys

prescriptions in September 2012, to 9.8 prescriptions in November 2013, to "[a] little over ten per week" in August 2014.  DE.234:176-177; DE.236:98-99.  Chun additionally "bragged" to other doctors at a 2014 program that "he was the highest paid speaker in the country for his prescription writing."  DE.238:255.

Chun also prescribed Subsys over competitor drugs even though "by far and away the Subsys was the most expensive,"  DE.235:153.  As the following exhibit (GEX:605) shows, Subsys represented 63% of Chun's Medicare prescriptions for fast-acting fentanyl medications during the conspiracy period:



This pattern deviated from the general approach where "the pharmacy or doctor … tend[s] to push [the patient] towards the generic because it's cheaper." DE:234:118.

Finally, the bulk of Chun's Subsys prescriptions to Medicare patients were at high dosages.  The following exhibit (GEX:610) categorizes Chun's

prescriptions by dose levels and identifies the Medicare payments associated with each category:



## II.    Course of Proceedings.

The government charged Chun and Tondre with conspiracy to violate, and substantive violations of, the Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), which prohibits the payment or receipt of kickbacks in connection with a federal healthcare program; and identity fraud.   DE.67.   At trial, the government presented the evidence summarized above.  Chun did not present an affirmative case, but Tondre testified.  He admitted forging doctor signatures

on sign-in sheets for Chun's programs, DE.240:115, but he denied participation in a kickback scheme.

At the close of evidence, the district court entered a judgment of acquittal for Chun on the identity-fraud counts.  DE.210.  The jury then found Chun and Tondre guilty on all other counts.  DE.242.12-14.  The court denied their post-verdict motions for acquittal.  DE.252.

## III.  Rulings Presented and Standards of Review.

Chun and Tondre challenge the sufficiency of the evidence supporting their convictions.  This Court conducts a de novo review of such claims, *see United States v. Azmat,* 805 F.3d 1018, 1035 (11th Cir. 2009), and examines "whether the evidence, when viewed in the light most favorable to the government, and accepting reasonable inferences and credibility choices by the fact-finder, would enable the trier of fact to find the defendant guilty beyond a reasonable doubt," *ibid.* (citation omitted).  This Court will affirm unless "no reasonable construction of the evidence" supports the jury's finding of guilt. *Ibid.* (citation omitted).

Chun challenges the district court's responses to two notes during jury deliberations.  This Court reviews the court's responses for abuse of discretion. *See United States v. Lopez*, 590 F.3d 1238, 1247 (11th Cir. 2009).

Chun challenges the district court's finding under Sentencing Guidelines § 2B4.1(b)(1) that the offense conduct conferred $4.5 million in improper benefits. This Court conducts a de novo review of the court's Guidelines interpretation and reviews its factual findings for clear error. *See United States v. DeVegter*, 439 F.3d 1299, 1303 (11th Cir. 2006).

This Court reviews unpreserved claims for plain error. *See United States v. Verdeza*, 69 F.4th 780, 788 (11th Cir. 2023). To obtain relief, the defendant must show a legal error that is "clear or obvious, rather than subject to reasonable dispute," affects his substantial rights, and so seriously undermines the fairness, integrity, and public reputation of judicial proceedings that this Court should exercise discretion to correct it. *Puckett v. United States*, 556 U.S. 129, 135 (2009). As explained below, Tondre did not preserve his sufficiency claim and Chun did not preserve his net-value objection to the district court's Guidelines calculation.

## SUMMARY OF ARGUMENT

1. The jury reasonably found that Chun participated in a years-long conspiracy to accept kickbacks in exchange for prescribing Subsys to his patients. The jury heard direct evidence that Chun understood and accepted the arrangement linking his speaker-program participation to his Subsys prescriptions. That testimony was bolstered by Chun's communications about his Subsys prescribing to sales representatives (who lacked any role in patient

care) and by records showing that Chun became a top Subsys prescriber while serving as a speaker and collecting payments.

The same record supports the jury's verdicts on the five substantive Anti-Kickback counts.  The government adduced evidence that the speaker programs undergirding these counts were shams based on the forged practitioner sign-in signatures and the purported attendance of practitioners who had already appeared at dozens of previous Chun programs.  The jury had ample reason to conclude that Chun knew these five programs were shams and, further, that the payments he received from those programs were in fact kickbacks for Subsys prescriptions.  The programs occurred in 2015, long after Chun joined the conspiracy, and they were small gatherings with either fake or repeat attendees—meaning that the attendance anomalies would have been apparent to him.  The jury thus had every reason to find that Chun knew these five programs fell within the broader kickback conspiracy and, accordingly, that Chun violated the Anti-Kickback Statute when he knowingly and willfully collected payment for each.

Finally, the record shows that Chun's Subsys prescriptions qualified as "an[] item or service for which payment may be made in whole or in part under a Federal health care program."  42 U.S.C. § 1320a-7b(b)(1).  Chun knew that his prescriptions might be paid, in whole or in part, by Medicare.

2.    The Anti-Kickback Statute's safe-harbor provision does not entitle Tondre to a judgment of acquittal.  The provision authorizes a defendant to raise an affirmative defense to kickback charges if he is a bona fide employee who receives payment for providing "covered items or services" under a federal healthcare program.  42 U.S.C. § 1320a-7b(b)(3)(B).  Because Tondre failed to assert the safe-harbor provision at trial, he waived the affirmative defense, and appellate review is therefore unavailable.  In any event, Tondre cannot show reversible plain error because the safe harbor does not apply to his conduct.  His sales activities do not constitute a covered Medicare service.  Furthermore, the kickback payments undergirding Tondre's convictions went to Chun.  Because Chun was not an Insys employee, the safe-harbor provision does not apply to those payments.

Because Tondre's kickback convictions are sound, his identity-fraud convictions—stemming from his unauthorized use of practitioner names, signatures, and license numbers on the speaker program sign-in sheets—should also be affirmed.

3.    The district court appropriately exercised its discretion when responding to the jury notes.  In the first, the jury requested summary exhibits containing information about the per-unit cost of the various Subsys dosages.  That information could be found in two exhibits, and the court identified the

corresponding exhibit numbers to the jury. In the second, the jury requested the exhibit number corresponding to a text message from Tondre in which he purportedly forwarded a message from Chun. The court identified the exhibits matching the jury's description. Each time, the court permissibly responded to a run-of-the-mill jury request seeking assistance in locating particular evidence that had been introduced at trial. And contrary to Chun's contentions, the court's response did not impermissibly state that the cited exhibits would resolve a particular factual question, place the court's imprimatur on the exhibits, focus the jury's attention away from other evidence, or inject extra-record material into its deliberations.

4. The district court did not plainly err in calculating the net value of the benefits conferred under Guidelines § 2B4.1(b)(1). The court found that the offense conduct conferred $4.5 million in improper benefits on Insys. No support exists for Chun's first contention that the court should have subtracted the cost of his kickback payments and speaker programs. Those expenses were not direct costs that Insys incurred as a specific result of Chun's prescriptions. Chun's second contention—that the costs of manufacturing Subsys should have been deducted—has theoretical merit. But because the record lacks any information about such expenses, the district court did not commit clear or obvious error in failing to consider this potential offset. Chun relatedly offers no

23

evidence that this omission prejudiced his substantial rights because the record contains no suggestion that manufacturing costs exceeded $1 million—the amount needed to affect his Guidelines range. Finally, any error is harmless because the district court announced that it would have imposed the same sentence irrespective of its Section 2B4.1(b)(1) findings.

## ARGUMENT

## I.    Ample evidence supports Chun's convictions.

Chun's sufficiency attacks (Br.30-45) on his convictions fail.

### A.    Chun joined a conspiracy in which he knowingly and willfully accepted kickbacks for his Subsys prescriptions.

The jury found Chun guilty of conspiring to defraud the United States by violating the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and substantive violations of this statute. Section 1320a-7b(b)(1) proscribes "knowingly and willfully solicit[ing] or receiv[ing] any remuneration (including any kickback, bribe, or rebate) … in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." Section 1320-7b(b)(2) similarly proscribes "offer[ing] or pay[ing]" any remuneration to "induce" such referrals. Thus, the statute proscribes "the knowing and willful receipt of a remuneration, namely, a kickback, in return for

24

referring a patient for [health care treatment], or payment of such remuneration in order to induce someone to make such a reference." *United States v. Njoku*, 737 F.3d 55, 63 (5th Cir. 2013); *see United States v. Sosa*, 777 F.3d 1279, 1293 (11th Cir. 2015) (statute prohibits "the giving or taking of kickbacks for medical referrals") (citation omitted).

### 1.    Conspiracy.

The jury had to find "(1) that a conspiracy existed; (2) that the defendant knew of it; and (3) that the defendant, with knowledge, voluntarily joined it." *Sosa*, 777 F.3d at 1290 (citation omitted).   "[T]he government need not demonstrate the existence of a formal agreement, but may instead demonstrate by circumstantial evidence a meeting of the minds to commit an unlawful act." *Ibid*. (citation omitted).

With respect to this charge, Chun accepts (Br.37-38) that "Insys may have been carrying out a conspiracy" to pay kickbacks to doctors for Subsys prescriptions.  But he denies his own knowledge of and voluntary participation in it.  The jury permissibly rejected this defense.

*First*, the jury heard direct evidence that Chun understood and accepted the arrangement linking his speaker-program participation to his Subsys prescriptions.  Burlakoff testified that he conveyed to Chun in August 2012 that "we're going to pay you, [and] you're going to prescribe Subsys."  DE.235:263.

Chun "[v]erbally … agreed" to that proposition. *Ibid.* Rosado likewise testified that Chun was present during conversations in which Rosado and Tondre discussed how "the more Dr. Chun wrote, the more prescriptions, the bigger the prescription, the more money [Tondre] would get, and Dr. Chun got about $3,000 a pop for the dinner." DE.237:282. Finally, a doctor testified that Chun "bragged" at an Insys training event that "he was the highest paid speaker in the country for his prescription writing."[4] DE.238:255. Crediting these witnesses, the jury could find that Chun "comprehended the true nature of his relationship to Insys"—an agreement to prescribe Subsys in exchange for speaker-program fees—and that he willfully participated in it. *United States v. Clough*, 978 F.3d 810, 818 (1st Cir. 2020); *see also United States v. Nerey*, 877 F.3d 956, 968-969 (11th Cir. 2017) (co-conspirator testimony that defendant "accepted and received kickbacks for referring patients … 'is sufficient to support a conviction'") (citation omitted).

*Second*, Chun communicated prescription updates to Tondre and his manager. *See* DE.238:27 (Chun: "I already wrote, not kidding, over 500 units of 1600 micrograms."); GEX:213B (Chun "looking for sub pts"); GEX.213D ("8 rx today already"); GEX:213E (Chun "knows numbers are low he is

---

[4] Chun dismisses (Br.37) his comment as "not indicative of any quid pro quo agreement" but the jury could have reasonably construed it that way.

working it"); GEX:293 (Chun: "Feels like another hug[e] day for Subs.  I have scheduled several cancer pts.").  These individuals had no role in patient care or prescriptions, but they controlled the speaker programs allotted to Chun.  The most logical explanation for Chun's updates to these medically untrained personnel: he was a willful participant in the deal to prescribe in exchange for speaker payments.  *See Clough*, 978 F.3d at 818 (conspiracy verdict supported by practitioner's "close working relationship" with Insys sales representative).

*Third*, Chun's Subsys prescriptions significantly increased while he served as a speaker and collected payments.  *See* pp.16-17, *supra*.  Chun's weekly average climbed from 1.6 prescriptions per week in 2012 to 10 prescriptions per week in 2014, and he became a top Subsys prescriber.  DE.234:176-177; DE.236:100.  That the conspiracy's object was successful in generating this significantly higher prescription rate is persuasive evidence that Chun knowingly and willfully participated in it.  *See Clough*, 978 F.3d at 818 ("A reasonable juror could infer that [the practitioner-defendant's] enthusiasm and prescribing practices came not from an infatuation with the drug's efficacy as [he] argues, but from his knowledge that Insys would pay him through speaking events if he were to maintain or to accelerate his eye-popping Subsys prescribing pace.").

Chun asserts a dearth of evidence supporting his conspiracy conviction, but his "contentions are in essence jury arguments."  *United States v. Scott*, 61

F.4th 855, 866 (11th Cir. 2023).  For instance, Chun claims (Br.35) that his "gradual[] accept[ance]" of Subsys, and not the speaker money, explains his increased prescribing.  But his brief fails to cite evidence supporting that explanation and, in any event, the jury was free to reject it.  Chun also cites (Br.35) a provision in his speaker agreement that programs would not be based on prescription writing.  But the jury was not obligated to credit that provision as fact—particularly given testimony that it had been inserted as a "cover your ass strategy" to "mask what [Insys was] really doing."  DE.234:144; *see Clough*, 978 F.3d at 918 ("The jury had sufficient evidence, viewed in the light most favorable to the verdict, to conclude that the written speaker agreement was nothing but a smokescreen.").  Chun further cites (Br.36) Insys communications about his prescription volume failing to meet expectations as evidence that no agreement existed.  But the jury could credit contrary testimony that Chun's prescriptions met Insys's thresholds.  Babich explained that Chun was "extremely profitable" for the company.  DE.234:196.  Burlakoff likewise testified that Insys's "return on investment [was] there" and that Chun followed through on his verbal agreement—even as Insys executives wanted him to prescribe more.  DE.236:88, 220; *see id.* at 87 (confirming that Subsys "ma[de] a ton of money off [Chun] … but you always want more").

28

Chun lastly insists (Br.37) that he "would not alter his practices based on any outside influence." The assertion is dubious given Chun's effort to switch patients who were happy on a competitor drug to Subsys. *See* pp.15-16, *supra*; *see also Clough*, 978 F.3d at 820 (evidence that practitioner "was apparently 'fairly insistent' about his patients taking the drug" supports kickback conspiracy). It is also legally irrelevant. The Anti-Kickback Statute does not require a showing that "the payments influenced the independent medical judgment of a doctor concerning a patient's care." *United States v. Gibson*, 875 F.3d 179, 189 (5th Cir. 2017) (quotation marks and citation omitted). The statute instead "protect[s] patients from doctors whose medical judgments *might be* clouded by improper financial considerations." *United States v. Patel*, 778 F.3d 607, 612 (7th Cir. 2015) (emphasis added). Because the record shows that Chun knew his speaker payments were tethered to his Subsys prescriptions and nonetheless accepted them, the conspiracy verdict is unassailable on sufficiency review.

### 2. Substantive Anti-Kickback Violations.

The jury also found that, on five occasions in 2015, Chun "knowingly and willfully … receive[d] any remuneration … in return for referring an individual to" a provider of "an[] item or service for which payment may be made" by Medicare. 42 U.S.C. § 1320a-7b(b)(1)(A). The proof supports these verdicts. It showed that the five speaker programs undergirding these substantive counts

were obvious sham events and, therefore, part of the larger kickback conspiracy that Chun had knowingly and willfully joined.

The evidence showed that the five speaker programs were sham events. The sign-in sheets for each listed forged signatures. *See* DE.235:74-76 (Chang testimony regarding 4/14/15 signature); GEX:92A-3 (Montoya 4/28/15 signature copied from different sheet, GEX:82A-10); GEX:93A-3 (Montoya 5/5/15 signature copied from different sheet, GEX:86A-3); GEX:94A-3 (Doshi 5/8/15 signature copied from different sheet, GEX:93A-5); DE.237:10-11 (Diaz-Ramirez testimony regarding 6/16/15 signature). Moreover, several attendees at each program appeared on several dozen sign-in sheets for previous Chun programs. *See* DE.239:215 (Doshi listed for 56 programs; De La Garza listed for 31 programs[5]); DE.241:49-51 (government closing argument listing repeat attendees). The jury could reasonably doubt that these practitioners attended all those programs, particularly in light of testimony that Tondre fabricated certain "straw clinicians" on the sign-in sheets. *See* p.13, *supra*.

The jury also had ample reason to conclude that Chun knew these five speaker programs were shams. These programs occurred in April, May, and June 2015—long after Chun joined the kickback conspiracy, participated in numerous other sham speaker programs (p.13, *supra*), increased his Subsys

---

[5] De La Garza also served as an Insys speaker. DE.237:282.

prescriptions, and accepted many thousand dollars from Insys. Moreover, these five programs were small gatherings at restaurants. Chun would have thus encountered one of two scenes when arriving at the table: practitioners whom he had seen at dozens of his previous programs or only sales personnel (because the practitioners' sign-ins had been forged). Either scene provided Chun a clear signal that this particular program lacked a legitimate educational purpose and, therefore, was part of the kickback scheme that he had joined.

This evidence satisfies the Anti-Kickback Statute's elements. First, Chun had accepted and long participated in the arrangement linking his Subsys prescriptions to his speaker-program participation. Second, the jury could accept the reasonable inference that Chun knew these five particular programs were sham events. Third, Chun collected payments from Insys for each one. The jury thus had ample basis to conclude that Chun understood that these five programs fell squarely within the kickback conspiracy and, accordingly, that Chun violated the Anti-Kickback Statute when he knowingly and willfully collected payment for each. *See generally* DE.237:300 (Rosado: describing a program's purpose as to "slip [Chun] $3,000" and "get more prescriptions").

For his part, Chun asserts (Br.32) a dearth of evidence documenting his responsibility for or participation in marketing the speaker programs, securing attendees, or forging the sign-in sheets. This assertion is factually dubious. The

31

jury heard testimony that Tondre consulted Chun on "who[m] he wanted" for his speaker programs. DE.237:280. In addition, Mandi Nehring (Chun's nurse practitioner) testified that her signature had been forged on sign-in sheets, DE.236:248-249, 257-261, DE.237:40-42; that her name had been misspelled on one sheet; and that Chun frequently misspelled her name in that same manner in their medical office, DE.236:248-249; DE.237:70-71. But Chun's assertion (even if true) is also immaterial to these substantive counts. Even if Chun lacked involvement in planning the speaker programs or forging the sign-in sheets, the record supports the critical inference: Chun knew that the speaker programs were shams and that his invitations to them were tethered to his Subsys prescriptions. Thus, when Chun appeared at the programs and accepted payment, he knew that he was being paid for prescriptions. He therefore knowingly and willfully violated the Anti-Kickback Statute.

Chun also references (Br.38-42) three decisions affirming a defendant's kickback convictions and argues that the evidence here is weaker. This comparison lacks significance because the cited decisions confirmed only that the evidence in those cases supported the juries' verdicts. They do not imply a defect in the evidence here. *See generally United States v. Kington*, 875 F.2d 1091, 1102-1103 (5th Cir. 1989) ("[T]he possibility of better evidence does not imply that the extant evidence is insufficient.").

Chun's comparisons also fail on their face. Two decisions involve practitioners who prescribed large amounts of Subsys in exchange for payments from Insys. The First Circuit in *Clough*, 978 F.3d at 816-821, rejected a sufficiency challenge to the defendant's convictions. In doing so, the court credited similar categories of proof that the government presented here—as confirmed by the government's repeated citations to *Clough* in its sufficiency discussion. *See* pp.25-29, *supra*. This Court's decision in *United States v. Ruan*, 966 F.3d 1101 (11th Cir. 2020), *vacated on other grounds*, 142 S. Ct. 2370 (2022), carries minimal relevance because the Insys kickback charge occupied a tiny sliver (one of 22 counts) of that proceeding. The Court's two-paragraph rejection of that sufficiency claim provides no support for Chun's arguments; in fact, the decision mentions some of the same evidence presented here. *See* 966 F.3d at 1146 (noting that defendant-practitioners were "top prescribers" of Subsys who received Insys payments for speaker programs that were "rarely attended"). The third decision, *Nerey*, addressed a defendant who received kickbacks for fraudulently recruiting purportedly homebound Medicare patients to home-healthcare services. *See* 877 F.3d at 963-965. That different scheme and factual record provide no useful comparisons for this case.

**B.    The jury reasonably found that this kickback scheme involved prescriptions that could trigger Medicare payments.**

Chun lastly asserts (Br.42-45) insufficient proof tethering the kickback scheme to Medicare.  This claim fails.

The Anti-Kickback Statute prohibits a practitioner from accepting remuneration in return for furnishing "any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(1).    The operative word here is "may."    The government "do[es] not have to show [Chun] knowingly referred federally insured patients for remuneration." *United States v. Shah*, 84 F.4th 190, 214 (5th Cir. 2023).    "All it had to show was that he knowingly agreed to accept remuneration for referring patients that *could* be federally insured." *Ibid*.

The trial evidence contains such proof.  Subsys was expensive.  Insys executives understood that the drug's success was dependent on pushing doctors to increase prescriptions *and* obtaining insurer coverage for them.  *See* DE.236:44 (Burlakoff: "if you're getting prescriptions written but they don't actually get covered by insurance, the company doesn't earn any money").  The company accordingly created the IRC to act on doctors' behalf, interact with insurers, and increase the rate of Subsys approvals.  *See* pp.9-10, *supra*.  That effort included Medicare.    *See* DE.237:128 (IRC processed authorizations for Medicare

34

patients); DE.237:171 (IRC tracked diagnosis codes and questions/answers that prompted Medicare approval). Simply put, the kickback scheme and payments sought to generate prescriptions for all patients—including Medicare ones. *See* DE.234:103 (Babich: Insys bribes included prescriptions covered by Medicare).

As documented above, the jury permissibly concluded that Chun joined a conspiracy where he received speaker programs and payments in exchange for issuing Subsys prescriptions. *See* pp.25-29, *supra*. Chun further understood that his patients needed insurance coverage for Subsys. *See* DE.232:79 (September 2012 report that Chun "is increasing the number of patients on Subsys and is really trying to work through coverage issues"). Finally, Chun knew some of his patients relied on Medicare—as evidenced by Chun's participation in the Medicare program (DE.239:166) and Chun's signature on forms authorizing Insys to contact Medicare on Chun's behalf to obtain authorization for a patient's Subsys prescription. GEX:390; GEX:391. Based on this proof, a reasonable jury could find Chun's awareness that he had issued Subsys prescriptions to patients who were, in fact, federally insured. This amply satisfies the Anti-Kickback Statute, which requires only that Chun "agreed to

accept remuneration for referring patients for services that *could* be paid for through a federal healthcare program."[6]  *Shah*, 84 F.4th at 214.

As Chun tells it, the government had to prove specifically that "Insys foresaw that any of the prescriptions *would* be covered by Medicare."  Br.44 (emphasis added).  As just discussed, that contention disregards the Anti-Kickback Statute's text.  "The Government did not need to prove that the defendants knew their conduct targeted *federal* healthcare programs."  *Shah*, 84 F.4th at 216.  Rather, "[i]t needed to prove that the defendants knew services to some patients they referred might be paid, in whole or in part, by a federal healthcare program."  *Ibid.*  The government met that burden below.

The jury reasonably credited the trial proof and found the Anti-Kickback elements satisfied on the conspiracy count and the five substantive receipt counts.  On deferential sufficiency review, its verdict on Chun passes muster.

---

[6] This conclusion applies to each substantive count.  A reasonable jury could find that, on five specific occasions in 2015, knowingly and willfully "accept[ed] remuneration for referring patients that *could* be federally insured."  *Shah*, 84 F.4th at 214.

## II.    Ample evidence supports Tondre's convictions.

Tondre contends (Br.16-24) that he was entitled to a judgment of acquittal on all counts based on the Anti-Kickback Statute's safe-harbor provision and various other sufficiency contentions.  This claim fails.

### A.    The Anti-Kickback Statute's safe-harbor provision provides no relief for Tondre.

The Anti-Kickback Statute contains a safe-harbor provision exempting certain employees from its sweep.  The safe harbor states that the illegal-remuneration provisions "shall not apply to … any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services." 42 U.S.C. § 1320a-7b(b)(3)(B).

Tondre contends that this provision exempts him from criminal liability for his Insys work.  That contention fails.

### 1.    Tondre waived this affirmative defense by failing to raise it at trial.

Defendants may raise the safe-harbor provision as an "affirmative defense" to kickback charges.  *United States v. Vernon*, 723 F.3d 1234, 1271 (11th Cir. 2013).  "The safe harbor provision is an affirmative defense which the defendant must prove, and a defendant who fails to present evidence supporting the defense is not entitled to the jury charge." *United States v. Turner*, 561 Fed

37

Appx. 312, 319 (5th Cir. 2014); *see also United States v. Norton*, 17 Fed. Appx. 98, 102 (4th Cir. 2001) (same).  In addition, affirmative defenses "must be asserted at trial by the defendant." *United States v. Najjar*, 283 F.3d 1306, 1308 (11th Cir. 2002) (discussing statute-of-limitations defense).  "'[A]n affirmative defense … is waived unless raised at trial.'" *Ibid.* (quoting *United States v. Gallup,* 812 F.2d 1271, 1280 (10th Cir. 1987)).

When Tondre failed to assert the safe-harbor provision at trial, he waived the defense.  The inquiry ends here.

In response, Tondre casts (Br.18-19) the safe harbor as "an essential element of the kickback statute" and its omission below as "structural error."  But this Court in *Vernon* classified it as an affirmative defense.  Tondre offers no contrary case law deeming the safe-harbor provision an element, much less a "basic, constitutional guarantee[]" that "affects the framework within which the trial proceeds" under the structural-error doctrine.  *United States v. Coats*, 8 F.4th 1228, 1237 (11th Cir. 2021) (quotation marks and citation omitted).

### 2.    In any event, the safe-harbor provision does not apply to Tondre's conduct.

At a minimum, Tondre's failure to raise the safe-harbor provision at trial restricts this Court's review to plain error.  And Tondre cannot show reversible

plain error.  Starting at the first step of the inquiry, Tondre's offense conduct falls outside the safe harbor.

First, the safe-harbor provision applies to "bona fide employees … providing 'covered items or services'" under a federal health care program. *United States v. Starks*, 157 F.3d 833, 839 (11th Cir. 1998) (quoting 42 U.S.C. § 1320a-7b(b)(3)).  In this case, Tondre marketed a fentanyl drug (Subsys) to doctors on behalf of a pharmaceutical company (Insys).  That marketing conduct does not involve "any legitimate service" eligible for "Medicare reimbursement." *Ibid*.  Tondre accordingly falls outside the safe harbor.

Second, the safe-harbor provision exempts "amount[s] paid by an employer to an employee … for employment in the provision of covered items or services" from its illegal-remuneration prohibitions.  42 U.S.C. § 1320a-7b(b)(3).  The kickbacks charged here, however, were *Insys's payments to Chun*— which Tondre facilitated.  That money was not "paid by an employer to an employee." *Ibid*.  Rather, Insys paid that money to Chun as "an independent contractor."   GEX:111:6 (Insys-Chun speaker agreement).  Because Chun lacked "'the status of an employee'" with Insys, *Vernon*, 723 F.3d at 1270-1271 (quoting 26 U.S.C. § 3121(d)(2)), these kickback payments fall outside the safe harbor.

39

But even if the safe harbor's application in this case were open to debate, the answer is not so clear or obvious as to merit relief under the second prong of the plain-error standard.

This Court's decision in *Carrel v. AIDS Healthcare Foundation*, 898 F.3d 1267 (11th Cir. 2018), is inapposite. There, a foundation paid an employee tasked with referring HIV patients to the foundation's healthcare services. *Id.* at 1269. This Court held that the safe-harbor provision applied because those payments went to "an employee of the Foundation" who had engaged in "compensable medical services" under federal law. *Id.* at 1273. In this case, by contrast, the kickback payments went to Chun—who was not an Insys employee. And Tondre himself was not performing compensable services.

Because the safe harbor does not apply to either Tondre or the payments at issue, much less clearly or obviously so, it does not supply grounds for his acquittal.

**B.    Tondre's other sufficiency arguments lack merit.**

The trial proof showed that Tondre "knowingly and willfully offer[ed] or pa[id] … remuneration … directly or indirectly" to Chun "for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under" Medicare. 42 U.S.C. § 1320a-7b(b)(2)(A). He

40

specifically directed speaker programs and payments to Chun because Chun prescribed Subsys.[7]

1.    Ample evidence demonstrates Tondre's knowledge that Chun's speaker programs were illegitimate.  While testifying at trial, Tondre called them "ignorant programs," DE:240:115, and said he "didn't think they were that helpful," *id*. at 79.  Tondre also admitted that he fabricated the sign-in sheets. DE.240:115.  Tondre's colleague (Andre Rosado) confirmed he and Tondre forged doctor signatures on those sheets to inflate attendance numbers for Chun's programs.  DE.237:290-291.  Yet Tondre kept scheduling the programs and Chun received $3,000 for each one.

The jury further reasonably concluded that Tondre used those speaker programs as a conduit to funnel payments to Chun for issuing Subsys prescriptions.  Tondre had a clear financial motive to do so.  His commissions were tied to Chun's prescriptions.  DE.234:126.  "[T]he more Dr. Chun wrote, … the more money [Tondre] would get."  DE.237:282:  Tondre also succeeded on this metric, earning over $737,000 in salary and commissions in just two-and-a-half years at Insys.  DE.239:228.  Chun's prescriptions alone fueled 90% of

---

[7] The fact that Tondre "did not pay Chun," (Br.13), by instead arranged speaker payments from Insys to Chun, is not exculpatory.  An individual who "aids" or "abets" a crime is punishable as a principle.  18 U.S.C. § 2(a).  So is an individual who "willfully causes an act to be done which if directly performed by him or another."  18 U.S.C. § 2(b)

Tondre's commissions, DE.234:197, and made him a top sales representative, DE.236:102-103.

Tondre's own words confirm his effort to link Chun's speaker programs to his Subsys prescriptions. Tondre directly told Chun: "[t]he more prescriptions, the better" and "[h]elp him get more Subsys." DE.237:281. Tondre also "frequent[ly]" discussed the relationship between Chun's prescribing, the speaker programs, and Tondre's compensation. DE.237:282. Finally, the morning after one speaker program, Tondre texted Chun: "Hope all is well and you got great rest. Hopefully soon we can go on a double date. Think Subsys." DE.238:27. Chun responded: "I already wrote, not kidding, over 500 units of 1600 micrograms." *Ibid.* Chun also provided Tondre with updates about his Subsys prescriptions. *See* GEX:213B, 213D, 213E.

This evidence illustrates the link between Chun's speaker programs, which Tondre organized, and Chun's Subsys prescriptions. It amply supports the jury's finding that Tondre conspired to, and did, violate the Anti-Kickback Statute.

2. *Tondre's rejoinders lack merit.* Tondre observes (Br.13) he did not work for Insys in August 2012—when Burlakoff communicated the speaker program/prescription expectations to Chun over dinner. But the jury could find that Tondre joined the scheme when he started at Insys months later. *See United States v. Paisley*, 178 Fed. Appx. 955, 960 (11th Cir. 2006) ("[A] defendant may

42

be found guilty of conspiracy even if he did not join it until after its inception."). Tondre also contends (Br.13) that Burlakoff's testimony cast him as a "patsy or scapegoat." That is wrong. Burlakoff testified that he hired Tondre because Tondre had previous "experience paying doctors to speak" and that Tondre subsequently executed the speaker programs and policies that he (Burlakoff) created. DE.236:37, 212-213. In fact, Burlakoff confirmed that he "allocate[d] [a] speaker budget to Dan Tondre so that he would pay Dr. Chun to speak as avenue for us to receive prescriptions of Subsys in return." DE.235:241. This testimony hardly exonerates Tondre.

Tondre (Br.13) notes that he did not pay Chun or set the amount of money Chun collected for each program. That misses the point. Tondre coordinated the programs and, accordingly, the speaker money flowing to Chun. And the proof amply supports the inference that, in steering these programs to Chun, Tondre sought to influence his prescribing. *See* pp.40-42, *supra*.

Tondre cites (Br.22-23) testimony from a pharmacist (Bhumin Patel) that Chun's programs had some educational value. The jury was under no obligation to credit that assessment—particularly given that Patel attended 10-15 Chun programs, confirmed that the later ones resembled a "family dinner" rather than a "presentation," and testified that his signature had been forged on sign-in sheets. DE.238:148-158. The jury also heard multiple other witnesses testify

43

that Chun's programs lacked attendees or an educational component. *See* p.13, *supra*. The jury could credit that testimony and the accompanying inference that Chun's programs were shams and served as a conduit to send kickbacks. *See United States v. Downs*, 61 F.4th 1306, 1316 (11th Cir. 2023) ("Credibility questions are the exclusive province of the jury.").

Finally, Tondre contends (Br.24) that the evidence debunked the government's contention at closing (DE.241:52-53) that two speaker programs scheduled for Chun at Patel's pharmacy never occurred. But Patel testified to that, DE.238:152-153, and the jury was free to believe him. And even assuming Tondre's contention that one event occurred with Chun participating by teleconference, it was still a sham because Chun's agreement with Insys authorized payments only for "in person" speaker programs. GEX:111 (Ex. A). Accordingly, even accepting Tondre's description of this one program, the jury still had ample reason to view it as an illegal conduit for kickbacks.

3.    Tondre briefly contends (Br.15) that "the identification fraud convictions must also fail" because they were "not … committed in relation to specified unlawful activity" under the Anti-Kickback Statute. These counts addressed Tondre's unauthorized use of practitioner names, signatures, and license numbers on the speaker program sign-in sheets. This contention fails.

44

Because the jury's verdicts on the Anti-Kickback counts are sound, Tondre's identification-fraud convictions should be affirmed.

## III. The district court appropriately exercised its discretion in responding to jury notes.

Chun challenges (Br.45-51) the district court's responses to two jury notes during deliberation.  Tondre summarily adopts (Br.1) this claim.

"A trial judge has some obligation to make reasonable efforts to answer a question from the jury." *United States v. Rodriguez,* 765 F.2d 1546, 1553 (11th Cir. 1985).  Because the district court reasonably discharged that obligation here, no abuse of discretion occurred.

### A.     Jury note regarding the per-unit cost of Subsys.

#### 1.     Background

The jury asked to review evidence concerning the cost of the different Subsys dosages:

> We, the jury would like to review … summary chart(s) from which cost per unit can be calculated for each of the strengths (including 600, 800, 1200, and 1600 mcg).
>
> …
>
> We would like to review any data from which we can calculate the per unit cost (not PDE) of the various strengths of Subsys to compare how much 1 x 600 mcg or 1 x 800 mcg costs compared to 0.5 x 1200 mcg or 0.5 x 1600 mcg.

45

DE:217:1-2.  In response, the government cited the Medicare prescription data in Exhibits 600 and 600A.  DE.241:170.  Each entry recorded a prescription issued by Chun to a Medicare patient.  DE.235:137.  Each entry also listed (among other information) the amount Medicare paid for the prescription, the medication's strength, and the number of units prescribed:[8]

| Data_Field | Description | Order | Excel_Column |
|---|---|---|---|
| PDE_Dispensing_Fee | Amount the pharmacy is paid for dispensing the medication. The fee may be negotiated with pharmacies at the plan or PBM level. Additional fees may be charged for compounding/mixing multiple drugs. Does not include any administrative fees. Vaccine Administration Fee reported in separate field. | 36 | AJ |
| PDE_Ingredient_Cost_AMT | Ingredient Cost paid. The amount the pharmacy is paid for the drug itself. Dispensing fees or other costs are not included in this amount. | 37 | AK |
| Drug_MDDB_product_name | Supplied name that appears on the label of all products, generic or brand | 60 | BH |
| Prod_descrip_abbrv | Drug name with strength | 63 | BK |
| PDE_Quantity_Dispensed | Number of Units, Grams, Milliliters, other. If compounded item, total of all ingredients will be supplied as Quantity Dispensed. | 68 | BP |

Tondre's counsel asked the district court to instruct: "there is no data to answer that question."  DE.241:175.  Echoing the jury note, the government responded that the jury "could calculate" the per-unit cost of the various Subsys

---

[8] The government's appendix reproduces all the data fields in Exhibits 600 and 600-A.  It does not reproduce the underlying prescription data, which is voluminous and contains patient medical information.  Upon request, the government will file that data under-seal.

strengths from these exhibits.    DE.241:176.    The court accepted the government's representation.  DE.241:177.  It then informed the jury:

> You might consult Government Exhibit 600 [and] the excerpt, 600A.  A laptop will be provided in the morning to view CD's.  You may or may not find these exhibits helpful.

DE:217:3.

### 2.    Discussion

a.    The district court properly exercised its discretion in crafting this response.  Exhibits 600 and 600A displayed information associated with each prescription issued by Chun to a Medicare patient.  As just cataloged, the spreadsheets displayed the drug name and strength, the number of units dispensed under the prescription, and the amount of money Medicare paid.  The jury could calculate the per-unit cost of a particular Subsys prescription using simple arithmetic: divide the cost of the drug by the number of units dispensed.

The district court thus properly exercised its discretion when instructing that the jury might consult Exhibits 600 and 600A.  For this same reason, the court properly exercised its discretion in declining a defense request to instruct that "there is no data to answer that question."  DE.241:175.  That answer would have been factually incorrect.

b.    Chun objects (Br.49) on the ground that "the Government's exhibits did not include data on the per unit cost of the various Subsys dosages."  But, as

47

documented, Exhibits 600 and 600A were directly responsive to the jury's note. These exhibits displayed information "from which [the jury] c[ould] calculate the per unit cost … of the various strengths of Subsys."  DE:217:2.

Chun further objects (Br.50) that the district court "directed the jury to specific Government exhibits and suggested that it utilize that evidence in making its determination."  That statement ignores the context of the court's response.  The jury's note did not ask an "open-ended question" inviting the court to "cull[]" the trial record" for the answer—thereby making the court, "'in effect … a finder of fact.'"  *United States v. Rivera-Santiago*, 107 F.3d 960, 965 (1st Cir. 1997) (citation omitted).  The note instead identified, with particularity, the evidence the jury sought to review: "summary chart(s) from which cost per unit can be calculated for each of the strengths (including 600, 800, 1200, and 1600 mcg)."  DE:217:1.  Chun cites no prohibition on a district court's identifying the trial exhibit corresponding with the jury's description and then providing the jury with that exhibit for review.

Chun lastly objects (Br.50) that the district court's response "failed to account for the fact that the use of the exhibits may well have been an inaccurate or unreliable means of determining the cost per unit because, by the Government's own concession, the exhibits displayed PDE calculations."  But the government did not concede below that Exhibits 600 and 600A offered an

unreliable means for calculating the per-unit cost of the different Subsys dosages. To the contrary, the government explained that the jury could ascertain this information from the exhibits, DE.241:176, and Chun offers no argument supporting his contrary position.

c.    This circumstance is far afield from *Rivera-Santiago*.  There, at a narcotics-trafficking trial, the government adduced evidence that a suspicious aircraft had dropped objects into the sea for retrieval by a vessel.  107 F.3d at 962.  Radio communications from a U.S. Customs aircraft reported "that immediately before the airdrop occurred, a vessel was seen flashing its lights in the area near the suspicious aircraft, and that the aircraft which had turned its lights on at some point before the airdrop turned them off shortly thereafter." *Ibid*.  The pilot also testified about the flashing lights.  *Id*. at 962-963.

During deliberations, the jury requested "information from the transcription notes to clarify some doubts."  107 F.3d at 964.  Specifically, the jury asked "[i]f there were any sign of flashing lights from the suspect aircraft and suspect vessel."  *Ibid*.  The district court informed the jury that it would "answer that question" by reading a portion of the pilot's direct testimony: "'I could see down into the water a flashing light'" and "'I saw an aircraft or what I believed to be an aircraft turn on its navigation recognition lights and fly at low altitude over the lights that were flashing in the water.'"  *Id*. at 964-965.

49

The First Circuit held that the district court's response "usurped the jury's factfinding role." 107 F.3d at 965. First, the court improperly "selected only a part of [the pilot's] testimony given on direct examination to be read in response to the jury's question and, in so doing, necessarily suggested to the jury that this testimony would provide 'the' answer to the jury's question." *Id.* at 965-966. This response thus "encourag[ed] the jury to believe [the pilot] and discourag[ed] the jury from considering and possibly crediting alternative accounts of the events surrounding the airdrop"—including "evidence that was inconsistent with, if not contradictory to, [the pilot's] assertion that he saw an exchange of lights during the airdrop between the suspicious aircraft and an object in the water." *Id.* at 966. Second, the court's response "had the effect of placing [its] imprimatur on the facts contained in that portion of [the pilot's] testimony that was read to the jury" and "focus[ing] the jury's attention … away from other evidence given by [the pilot] and others that was relevant to a resolution of the doubts the jury expressed in its note." *Ibid.*

Those dangers are not present here. In response to the jury's question seeking summary exhibits regarding the per-unit cost of the Subsys dosages, the district court advised that the jury "might consult Government Exhibit 600 [and] the excerpt, 600A" and that the jury "may or may not find these exhibits helpful." DE:217:3. The court's tentative language avoided the defect in *Rivera-*

50

*Santiago*—where the judge identified specific evidence that "would provide 'the' answer to the jury's question." 107 F.3d at 966. The district court also generically referenced the exhibits as a whole. Unlike in *Rivera-Santiago*, it did not identify particular portions of Exhibits 600 and 600A, much less place its "imprimatur of the facts contained" therein. *Ibid*. Finally, Exhibits 600 and 600A were "summary charts" (which the jury specifically referenced in its note) and constitute the only proof in the record addressing the per-unit cost of Subsys. The district court's response accordingly did not "focus the jury's attention … away from other evidence … that was relevant to a resolution of" its question. *Ibid*. *Rivera-Santiago* thus fails to support Chun's contention that the court abused its discretion.

## B.    Jury note regarding text messages.

### 1.    Background

The government's closing referenced several text messages that Tondre transmitted:

> The text messages from Dan Tondre's phone start in September of '13, and they include these two texts forwarded from Chun on September the 18th of 2013. These are clearly forwarded from Chun.

DE.241:56. During deliberations, the jury "request[ed] the exhibit number associated with a text message from defendant Tondre in 2013 in which he

'forwards' in part a direct message purportedly from defendant Chun and whose original message is not present in evidence."  DE.217:5.

In response, the government identified two exhibits with text messages where Tondre referenced: "From chun."

| | Date | Time | Extracted Text |
|---|---|---|---|
| : | 9/18/2013 | 10:22:39 | To: 8508902131<br>Date: 09/18/2013 10:22:39 AM -04:00<br><br>From chun You got already 1600mcg times 90. |
| : | 9/18/2013 | 10:23:12 | To: 8508902131<br>Date: 09/18/2013 10:23:12 AM -04:00<br><br>From chun this amLooking for sub pts. |

| Date | Time | Extracted Text |
|---|---|---|
| 10/3/2013 | 3:22:01 | To: 8508902131<br>Date: 10/03/2013 03:22:01 PM -04:00<br><br>From chun Git going ast least 3 new pts. Not to mention usual follow up pts times 8 rx today already |

DE.242:3 (citing GEX:213B, 213D).  The government identified a third exhibit (GEX:212B) with the same message sent to a different recipient.  DE.242:7.

Tondre's counsel objected that the government's closing had referred to these messages as "forwarded"—which was "not evidence" and "inaccurate"

because "when you look at the text … it is not a forwarded text." DE.242:5. Counsel asked the district court to inform the jury that "[t]here is no forwarded text in evidence referring to this matter." DE.242:6. The government responded that it had displayed the text messages during closing and argued, without objection, that "it [was] a forwarded text message." *Ibid*. The government further responded that "[t]he jury ha[d] asked for a text message that was purportedly forwarded" and "the jury can make and will make a decision on whether this text message actually was forwarded." DE.242:7.

The district court announced that it would "not … comment on the evidence" and "not … say this is a forwarded message." DE.242:8. The court also rejected a request from Chun's counsel to advise jurors "to rely on your memory and the evidence that's in the jury room." DE.242:9. The court then informed the jury: "You may be referring to Exs. 212B, 213B, and 213D?? Please consider all the evidence as a whole." DE.217:6.

### 2. Discussion

The district court again appropriately exercised its discretion in providing this response. This trial involved many hundred exhibits, the jury wanted to review a text message that the government referenced at closing, and it sought assistance identifying the exhibit number. The district court reasonably

provided the jury with exhibit numbers associated with text messages that matched the jury's description.

Chun objects (Br.51) that the government's closing argued facts not in evidence. Because Chun lodged no contemporaneous objection at closing, this Court's review is restricted to plain error, *see United States v. Maradiaga*, 987 F.3d 1315, 1321 (11th Cir. 2021), and that standard forecloses his claim. "[A] prosecutor may argue both facts in evidence and reasonable inferences from those facts." *United States v. Gonzalez*, 834 F.3d 1206, 1226 (11th Cir. 2016) (citation omitted). Here, the trial record amply supported the government's proffered inference that the text messages originated with Chun because Tondre prefaced each one with the header: "From chun." *See* p.52, *supra*. The messages also discussed contemporaneous efforts to prescribe Subsys to patients: "You got already 1600 [micrograms] times 90"; "this am[,] Looking for sub pts"; and "G[ot] going a[t] least 3 new pts." *Ibid*. Such prescription updates are logically associated with Chun because Tondre—a sales representative—could not prescribe Subsys. Finally, during his trial testimony, Tondre discussed a text message to his manager stating: "from Aqsa, everything is under control." DE.240:223. Tondre agreed that this "appear[ed] to be" a forwarded message. *Ibid*. The government's closing fairly interpreted the "From chun" messages in

54

the same light.  In any event, the government's inference was certainly not so improper as to merit plain-error relief.

Chun next argues (Br.51) that the government "was unclear as to which exhibits [it] was relying on" at closing and the district court "plugged a hole in the Government's case."  That contention lacks merit.  The government's closing discussed the text messages in detail and the exhibits listed by the court aligned with the government's factual description. Chun offers no basis to infer that the government's closing addressed different text messages.

Finally, Chun states (Br.51) that "the district court's answer to the jury question … validated the Government's claim that the text messages were forwarded from [him]."  Chun is wrong.  The jury requested the exhibit number for "a text message from defendant Tondre in 2013 in which he 'forwards' in part a direct message purportedly from defendant Chun and whose original message is not present in evidence."  DE.217:5.  That note demonstrates the jury's accurate understanding of the evidentiary landscape: the trial record did not contain any text messages from Chun, only messages by Tondre "purportedly from" Chun.  The district court's response—"You may be referring to Exs. 212B, 213B, and 213D??"—did not engage that factual issue, much less validate the government's proffered inference.  DE.217:6.

55

Chun's reliance on *United States v. Neff*, 10 F.3d 1321 (7th Cir. 1993), is misplaced. During deliberations in that firearms-possession case, the jury asked: "(1) what time were the police at the house to take [the defendant] into custody?; (2) was [the defendant] released after questioning?; and (3) what time did officer Meldrum pick up [the defendant's brother's] wife and go to the house to get the stereo?" *Id.* at 1323. The district court answered them. *Ibid.* Because "the judge's answers introduced additional facts that [were] not found in the evidence presented at trial," *id.* at 1325, the Seventh Circuit found a violation of the defendant's Sixth Amendment right to jury trial based on "only that evidence which is presented in open court," *id.* at 1326.

The district court's response here, by contrast, did not inject extra-record evidence into the jury room. The court instead permissibly answered a "usual run-of-the-mill jury request[]." *Neff*, 10 F.3d at 1325; *see ibid.* (noting that juries ask "to rehear evidence that had previously been introduced and developed at trial").

## C.   Any error was harmless.

Even if the district court erred in responding to the jury notes, it was harmless. *See United States v. Bokine*, 523 F.2d 767, 770 (5th Cir. 1975); *see also Rivera-Santiago*, 107 F.3d at 966-967 (conducting harmless-error review); *Neff*, 10 F.3d at 1326 (same). The notes address two insignificant slivers of the proof.

56

On the first note, the inference that stronger Subsys dosages generated higher revenue for Insys was not disputed at trial. The jury heard testimony confirming this fact. DE.234:115; DE.236:8. Other Medicare data— unchallenged on appeal—also illustrated this. *See* p.18, *supra*.

On the second note, each text message uses the header, "From chun," showing that Tondre communicated with Chun before sending it. Irrespective of who actually typed out the message, each one relayed Chun and Tondre's discussions about finding new patients for Subsys prescriptions or selecting a high Subsys strength. The jury also reviewed other evidence—unchallenged on appeal—documenting Chun's communications with Insys personnel about his Subsys prescribing. *See* GEX:213E, 293.

These observations—alongside the other overwhelming evidence of Chun and Tondre's involvement in the kickback scheme—yield one conclusion: any error by the district court was harmless.

## IV.    No reversible error occurred at sentencing.

Chun asserts (Br.52-56), and Tondre adopts the claim (Br.1), that the district court procedurally erred in calculating his Guidelines range. This claim fails.

57

## A.    Background.

Sentencing Guidelines § 2B4.1 sets a base offense level of 8 for a defendant convicted of a kickback offense.  But "[i]f the greater of the value of the bribe or the improper benefit to be conferred … exceeded $6,500," the Guidelines instruct the sentencing court to "increase" the defendant's offense level "by the number of levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount."  U.S.S.G. § 2B4.1(b)(1).

1.    The Probation Office found that Medicare paid over $4.5 million for Subsys prescriptions written by Chun.  Chun PSR ¶ 23.  It explained that "the prescriptions were improperly prescribed and the result of an illegal kickback scheme, which resulted in an improper benefit of $4,541,212 [in Medicare payments], was conferred by the bribes."  Chun PSR Addendum ¶ 3. The Probation Office accordingly recommended an 18-level enhancement. Chun PSR ¶ 40b; *see* U.S.S.G. § 2B1.1(b)(1)(J) (18-level enhancement for amount exceeding $3.5 million).  It then calculated Chun's Guidelines range at 78-97 months, reflecting an offense level of 28 and a criminal history category of I.  Chun PSR ¶ 87.

The Probation Office recommended the same enhancement and range for Tondre.  Tondre PSR ¶¶ 38b, 88.

2.    Chun objected, arguing that the "improper benefit" for purposes of Guidelines § 2B4.1(b)(1) was "equivalent to the amount of the alleged bribe" and that his alleged kickbacks totaled "less than $250,000."[9]  DE.284:1.  He proposed a 10-level enhancement and a Guidelines range of 27-33 months.  *Id.* at 6.  Chun argued that the Probation Office's calculation was wrong because that "there was no loss to Medicare whatsoever."  *Id.* at 2.  He asserted that "the patients were properly prescribed medications, the pharmacy submitted the prescription claim, and Medicare reimbursed the claim."  *Ibid.*

The government supported the Probation Office's calculation, arguing that "the offense level should be determined by the amount paid by Medicare— that is the value of the action taken in return for the bribe."  DE:265.2.

The district court overruled Chun's objection.  DE.331:24-25.  The court explained that Guidelines § 2B4.1(b)(1) "focus[es] on the benefit to be conferred to the briber."  DE.331:22.  It reasoned that "the improper benefit to be conferred was the revenue that [Insys] got from the Subsys prescriptions."  DE.331:20.  The court stressed that "the whole reason for bribing these doc[tors] [was] so [Insys] could get more revenue."  *Ibid*

---

[9] Chun received over $278,000 in speaker payments.  *See* Chun PSR ¶ 18. Chun defended some payments as legitimate and, accordingly, urged this lower amount.  DE.284:5.

The district court adopted a Guidelines range of 78-97 months but varied downward and sentenced Chun to 42 months. DE.331:26, 59. In justifying this variance, the court found that Guidelines § 2B4.1 "[was] somewhat overstated" in this case. *Id.* at 61. It also credited Chun's crime-free record and support for his elderly mother. *Ibid.*

The government inquired whether the district court would have imposed the same term under 18 U.S.C. § 3553(a) if it had sustained Chun's objection. DE.331:67. The court responded that the 42-month term "would still be my sentence" even "if I had ruled in [Chun's] favor on the guidelines." *Ibid.* The court reasoned that this penalty was "the fairest sentence balancing all the situation here." *Ibid.*

3.    Tondre adopted Chun's objection at sentencing. DE.344:5. The district court applied the same 18-level enhancement and Guidelines range. *Id.* at 4-5, 11. The court then varied downward and sentenced Tondre to 48 months. *Id.* at 45. Finally, the court announced that it would have imposed the same sentence irrespective of Tondre's objection. *Id.* at 48. It found that the 48-month term was "an appropriate sentence" under "the guidelines … the way [it had] found them or in the manner that [Tondre's counsel's] urged." *Ibid.*

60

**B.    The district court did not plainly err in calculating the net value of the benefits conferred.**

Guidelines § 2B4.1(b)(1) requires courts to calculate the "improper benefit to be conferred." That phrase means the "value of the action to be taken or effected in return for the bribe." U.S.S.G. § 2B4.1 cmt. n.2. The commentary also references Guidelines § 2C1.1, which provides that "'the benefit received or to be received' means the net value of such benefit." U.S.S.G. § 2C1.1 cmt. n.3. This Court has accordingly interpreted Section 2B4.1 as assessing the "net value" of the improper benefit. *United States v. DeVegter*, 439 F.3d 1299, 1303 (11th Cir. 2006) (quotation marks omitted).

Chun contends (Br.54-56) that the district court erred in assigning $4.5 million in improper benefits. He argues (Br.55) that this calculation erroneously reflected "the gross value of the value to be conferred" on Insys rather than the net value. But Chun did not raise this objection below in his sentencing memorandum or at his sentencing hearing. Chun instead claimed that improper-benefits calculation was zero and that the district court should calculate the Guidelines § 2B4.1 enhancement based on the total kickback money he received. DE.284:1-6; DE.331:20.

Because Chun did not advance his net-value objection below, this Court's review is restricted to plain error. *See United States v. Corbett*, 921 F.3d 1032, 1035

(11th Cir. 2019) (plain error applies where defendant "objected to each enhancement in the district court, but on different grounds from her arguments on appeal"). He cannot meet that demanding standard.

Chun first contends (Br.54) that the district court should have subtracted the cost of his kickback payments and speaker events. That contention lacks merit. Under Section 2B4.1(b)(1), courts "subtract[] direct costs, but not indirect costs, from profits to determine the net improper benefit." *DeVegter*, 439 F.3d at 1304. Direct costs refer to "'all variable costs that can be specifically identified as costs of performing a contract,'" whereas indirect costs refer to "variable overhead costs not easily identifiable to a specific contract." *Ibid.* (citation omitted). The illegal kickback payments and speaker-programs expenses were not direct costs that Insys incurred as a result of Chun's prescriptions—*i.e.*, the costs of supplying Subsys to those patients. Section 2B4.1(b)(1) accordingly "ignore[s]" those costs when calculating the net value of the improper benefit. *DeVegter*, 439 F.3d at 1304.

Chun next contends (Br.54) that the district court should have subtracted the costs of manufacturing the Subsys associated with his prescriptions. The government agrees that manufacturing expenses are direct costs that Insys incurred as a result of Chun's prescriptions. But this claim fails at the second step of plain-error review. A court need only make "a reasonable estimate of

62

the improper benefit" under Guidelines § 2B4.1(b)(1).  *United States v. Gonzalez*, 566 Fed. Appx. 898, 902 (11th Cir. 2014).  The Probation Office recommended a $4.5-million figure based on the total Medicare payments for Chun's Subsys prescriptions.  As Chun concedes, the record lacks any evidence about Subsys manufacturing expenses.  *See* Br.55.  As a result, the district court did not commit clear or obvious error in failing to *sua sponte* consider such an offset.

Chun's claim also fails at the third step of plain-error review.  Section 2B4.1(b)(1) authorizes an 18-level enhancement where the improper benefit exceeds $3.5 million.  *See* U.S.S.G. 2B1.1(b)(1)(J).  For the manufacturing costs to make a difference here, they would have to exceed $1 million— approximately 22% of the Medicare payments.  The record contains no evidence suggesting that amount.  And because "[i]t is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice" at this third step, Chun cannot obtain relief on this ground.[10]  *United States v. Olano*, 507 U.S. 725, 734 (1993).

---

[10] Chun criticizes (Br.54-55) the government for failing to present evidence of deductible direct costs at sentencing.  Because Chun did not raise the issue, the government lacked notice that this issue was material or disputed.

**C.    In any event, the district court stated that it would have imposed the same sentence using its 18 U.S.C. § 3553(a) discretion.**

Under *United States v. Keene*, 470 F.3d 1347, 1349 (11th Cir. 2006), this Court "need not review an issue when (1) the district court states it would have imposed the same sentence, even absent an alleged error, and (2) the sentence is substantively reasonable." *United States v. Goldman*, 953 F.3d 1213, 1221 (11th Cir. 2020).  In this circumstance, any error in the Guidelines calculation will be harmless. *Ibid*.

Such is the case here.  First, the district court announced that it would have imposed the same 42-month and 48-month sentences on Chun and Tondre even if it had sustained their objections to the Section 2B4.1(b)(1) enhancement.  DE.331:67; DE.344:48.

Second, the 42-month and 48-month terms are substantively reasonable.  The district court granted significant downward variances to Chun and Tondre because it found that the Section 2B4.1(b)(1) enhancement "overstated" their offense conduct.  DE.331:61.  The court also granted this variance after considering other sentences in its district.  DE.344:45.  Finally, the court stressed that Chun's and Tondre's sentences were "fair[]" and "appropriate" based on the offense conduct and the trial evidence.  DE.331:67; DE.344:48.

64

Therefore, even if the district court had sustained Chun and Tondre's Section 2B4.1(b)(1) objection, their sentences fall well within the court's discretion under 18 U.S.C. § 3553(a).  Any Guidelines error was accordingly harmless.

## CONCLUSION

The Court should affirm the district court's judgments.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

DAVID P. RHODES
Chief, Appellate Division
Middle District of Florida

NICOLE M. ARGENTIERI
Acting Assistant Attorney General

LISA H. MILLER
Deputy Assistant Attorney General

/s/David M. Lieberman
DAVID M. LIEBERMAN
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530
(202) 262-6805
david.lieberman@usdoj.gov

65

**CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,997 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared on a proportionally spaced typeface using Microsoft Office 365 in 14-point Calisto MT font.

/s/David M. Lieberman